**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

RUTH PASYUK,

Plaintiff,

v.

SOUTH UNIVERSITY OF FLORIDA – MEMBER, LLC, a Florida limited liability company d/b/a South University, West Palm Beach; SOUTH UNIVERSITY SAVANNAH, LLC, a Georgia limited liability company; CAITLIN SPAULDING, individually; KIMBERLY DAWKINS, individually; MATTHEW HOLZ, individually; and LYSA DIGGINS, individually,

Defendants.
_________________________________/

**PLAINTIFF RUTH PASYUK'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Ruth Pasyuk ("Plaintiff"), sues Defendants South University of Florida – Member, LLC ("South University–Florida"), South University Savannah, LLC ("South University–Savannah"), and Caitlin Spaulding, individually ("Spaulding"), Kimberly Dawkins, individually ("Dawkins"), Matthew Holz, individually ("Holz"), and Lysa Diggins, individually ("Diggins"), and alleges:

**INTRODUCTION**

1. South University expelled a physician-assistant student for having a panic attack, months before graduation — despite certifying to the federal government only six weeks earlier that she was enrolled in good standing.

2. On December 5, 2025, the University moved Plaintiff's accommodated testing group to another room while she was in the restroom and never told her where it had gone. Plaintiff suffered an acute panic attack that its own employees documented as shaking,

uncontrollable crying, and scratching her own neck until it was red. Within five hours, the University suspended her for “Abuse, Assault and Threats.” Four days later — before any hearing had been held — the notice scheduling her “hearing” announced that she had already “been found responsible” and would be expelled.

3. The University did this knowing — from the emotional-health leave it had approved and conditioned on medical clearance, the re-entry monitoring plan it had imposed, its own committee’s minutes, and the mental-health treatment records its Program Director collected and kept — that Plaintiff has a psychiatric disability. Plaintiff seeks reinstatement, correction of her record, and damages under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Florida law.

**PARTIES**

4. Plaintiff Ruth Pasyuk is a natural person, sui juris, domiciled in Florida. At all material times she was enrolled in the Master of Science in Physician Assistant program (the “PA Program”) at the University’s West Palm Beach campus, 9801 Belvedere Road, Royal Palm Beach, Palm Beach County, Florida.

5. Defendant South University–Florida is a Florida limited liability company doing business as “South University, West Palm Beach.” It operates the West Palm Beach campus and the PA Program. Its 2026 annual report lists its principal address as 709 Mall Boulevard, Savannah, Georgia 31406.

6. Defendant South University–Savannah is a Georgia nonprofit limited liability company with its principal office at 709 Mall Boulevard, Savannah, Georgia 31406. It is the sole member of South University–Florida.

7. South University–Florida and South University–Savannah are referred to together as “South University” or “the University.” Unless an allegation says otherwise, each act alleged against the University is alleged against each of them: against South University–Florida, which operates the West Palm Beach campus and the PA Program where the campus officials named in paragraph 13 worked, and against South University–Savannah, which participated through its own officers and policies as alleged in paragraph 8. The University owns and operates the PA Program, a postgraduate private school and therefore a place of public accommodation under 42 U.S.C. § 12181(7)(J).

8. South University–Savannah directly participated in the conduct alleged. It manages South University–Florida as the sole member of a member-managed company; South University–Florida's articles require it to "be operated exclusively in a manner that will compliment and further promote the exempt purpose of its sole member, South University Savannah, LLC"; its officers set the system-wide policies applied to Plaintiff, including the Academic Catalog and Code of Conduct described in paragraph 22; and Ebony Settles, Ed.D. ("Dr. Settles"), its Assistant Vice Chancellor for Student Success, based in Savannah, directed Plaintiff's disability accommodation, was copied on her interim suspension, and issued the decision on her disciplinary appeal. In the alternative, South University–Florida acted as South University–Savannah's agent or mere instrumentality.

9. Defendant Caitlin Spaulding, MMS, PA-C ("Professor Spaulding"), is the PA Program's Director of Clinical Education. She is sued in her individual capacity on Counts XX, XXI, and XXVII, the only counts asserted against her. At all material times she worked at the University's West Palm Beach campus, and the acts alleged against her occurred in Palm Beach County, Florida.

10. Defendant Kimberly Dawkins, DMSC, PA-C ("Dr. Dawkins"), is the PA Program's Assistant Program Director and the chair of its Student Progress and Promotions Committee ("SPPC"). She is sued in her individual capacity on Count XXV, the only count asserted against her. At all material times she worked at the University's West Palm Beach campus, and the detention she directed occurred in Palm Beach County, Florida.

11. Defendant Matthew Holz, D.O. ("Dr. Holz"), is an emergency physician at Palms West Hospital in Palm Beach County, Florida, who precepts PA Program students in their clinical rotations and lectures in the PA Program as adjunct faculty. He is sued in his individual capacity on Count XXVI, the only count asserted against him.

12. Defendant Lysa Diggins, MMS, PA-C ("Professor Diggins"), is the PA Program's Program Director. She is sued in her individual capacity on Count XXVII, the only count asserted against her. At all material times she worked at the University's West Palm Beach campus in Palm Beach County, Florida.

13. The University acted through its officers, employees, and agents, each acting within the course and scope of employment or agency, including Jocelyn T. Dean, Ed.D., Dean of Student Affairs ("Dr. Dean"); Professor Spaulding; Dr. Dawkins; Professor Diggins; Dr.

Settles; Tia Solh, Director of Student Success and Evaluation; Martin Fidelia, Assistant Director of Clinical Education; and, as adjunct faculty, Dr. Holz. Dr. Dean, Dr. Settles, and Professor Diggins each had authority to address disability discrimination against Plaintiff and to institute corrective measures on the University's behalf; Dr. Dean was, in addition, the University's designated compliance official under its Non-Discrimination Policy (paragraph 24).

**JURISDICTION AND VENUE**

14. This Court has subject-matter jurisdiction over Counts I through VIII under 28 U.S.C. §§ 1331 and 1343(a)(4) because they arise under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12181 et seq. and 12203, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

15. This Court may grant the declaratory and further relief sought in Count IX under 28 U.S.C. §§ 2201 and 2202.

16. This Court has supplemental jurisdiction over Counts X through XXIX under 28 U.S.C. § 1367(a) because they arise from the same facts as the federal claims and form part of the same case or controversy, including the claims against the individual Defendants, each of which arises from the same course of conduct that led to Plaintiff's expulsion.

17. This Court has personal jurisdiction over South University–Florida because it is a Florida company operating in Florida; over South University–Savannah under Fla. Stat. § 48.193(1)(a)1., 2., and 7., because it operates a business in Florida through South University–Florida, committed tortious acts in Florida, and breached in Florida a contract requiring performance in Florida; and over Spaulding, Dawkins, Holz, and Diggins because each works in Florida and committed in Florida the tort alleged against him or her.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Palm Beach County, Florida. These claims arose in Palm Beach County, and this action is properly filed in the West Palm Beach Division. See S.D. Fla. L.R. 3.1.

**CONDITIONS PRECEDENT**

19. All conditions precedent to this action have occurred, have been performed, or have been excused. Plaintiff pursued every internal appeal the University made available to her.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Enrollment and the Contract Between the Parties

20. Plaintiff matriculated into the PA Program on January 13, 2024. She paid the University approximately $118,000 in tuition and fees, financed almost entirely with federal Direct Loans she remains obligated to repay.

21. The University participates in the federal student-aid programs under Title IV of the Higher Education Act, under a Program Participation Agreement with the United States Department of Education (OPEID 01303900) that the Department requires to be signed by authorized representatives that include South University Savannah, LLC, and it disbursed federal Direct Loans to Plaintiff to pay her tuition. The University is therefore a recipient of federal financial assistance, and the PA Program is part of a "program or activity" under 29 U.S.C. § 794(b)(2)(A).

22. The terms of the parties' relationship are stated in (a) the Enrollment Agreement Plaintiff signed and the University accepted (paragraph 23); (b) the South University Academic Catalog (the "Catalog"), which the Enrollment Agreement incorporates and which contains the University's Code of Conduct and disciplinary procedures, its Physician Assistant Code of Conduct, its Physician Assistant Program Progression Policy, and its Non-Discrimination Policy and Student Grievance Procedure; (c) the South University, West Palm Beach Physician Assistant Program Student Handbook 2025–2026 (the "Handbook"), which the University posted on its website no later than November 25, 2024, cited to Plaintiff by page in its April 4 and July 1, 2025 letters, and emailed to Plaintiff on November 19, 2025, and relevant excerpts of which are attached as Exhibit A; and (d) the disability-accommodation documents attached as Exhibits B, C, and D.

23. Plaintiff signed the University's Enrollment Agreement for the PA Program, dated November 27, 2023, and the University's Chancellor countersigned it as the accepting official; the University has produced the executed Agreement from its own files. The Agreement states that it "has legally binding terms and conditions of your enrollment once you choose to begin classes at South University." It incorporates the Catalog, which Plaintiff acknowledged "contains information describing programs offered, academic requirements, and other important policies and procedures," and it contains no arbitration clause, forum-selection clause, or jury waiver.

24. The Enrollment Agreement, the Catalog, and the University's Code of Conduct each carry the University's Non-Discrimination Policy: South University "does not discriminate or harass on the basis of . . . disability"; "provides reasonable accommodations to qualified individuals with disabilities"; and "will not retaliate against persons bringing forward allegations of harassment or discrimination." The Enrollment Agreement provides that "[t]he campus Dean of Student Affairs has been designated to handle inquiries and coordinate the institution's compliance efforts regarding the Non-Discrimination" policy, and the Catalog and the Code say the same of "the campus' compliance efforts." At the West Palm Beach campus, that official was Dr. Dean.

25. The Catalog makes its "Student Grievance Procedure for Internal Complaints of Discrimination and Harassment" the channel for disability complaints: its Disability Services policy states that "[c]omplaints will be handled in accordance with the school's Internal Grievance Procedure for Complaints of Discrimination and Harassment." That procedure "is intended to provide a fair, prompt and reliable determination about whether the campus Non-Discrimination Policy has been violated." A student who believes she has been subjected to discrimination files a written complaint "with the campus Dean of Student Affairs"; "South University will investigate the allegations"; and the student "shall be informed promptly in writing when the investigation is completed, no later than 45 calendar days from the date the complaint was filed," and "shall be informed if there were findings made that the policy was or was not violated."

26. The Catalog's "Master of Science in Physician Assistant Code of Conduct" provides that "[f]ailure to comply with general University policies will result in referral to the Student Progress and Promotions Committee (SPPC) according to defined disciplinary procedures enforced which may result in dismissal from the program," and that "[a]ll Code of Conduct violations will be reported to the Student Progress and Promotions Committee and will be considered relative to the student's suitability for continued participation in the program and/or entry into the Physician Assistant (PA) profession."

27. The Handbook and the Catalog give a dismissed PA student the same three-level appeal. Under the Handbook's "Student Appeal Procedures for Dismissal," students "seeking to appeal any academic, clinical, and/or professional behavior dismissal (including academic/financial aid dismissal, Student Progress and Promotions Committee decisions, and/or

Code of Conduct violations) must do so in writing to the Department Chair within three business days of receipt of notification of their dismissal"; a student not satisfied with the Department Chair's decision may appeal to the Assistant Dean of the College of Health Professions and then to the Dean of the College of Health Professions; and "[t]he decision of the Dean of the College of Health Professions is final." The Catalog's Physician Assistant Program Progression Policy provides the same appeal for "any dismissal (including academic/financial aid dismissal, Student Progress and Promotions Committee decisions, and/or Code of Conduct Violations)." Both add that a dismissed student "may choose to appeal the decision and will not be allowed to continue program related activities until resolution of the appeal."

28. The University's Student Code of Conduct, published in the South University Student Handbook and incorporated by the Catalog, promises that "[a]ny student suspected of a violation of these regulations will be accorded due process as outlined herein." Its "Procedures Regarding Student Dismissals" provide that when "the Administration proposes to dismiss/expel a student from South University," "[t]he charges against the student shall be presented to the student in written form, including the time, place and nature of the alleged offense(s)"; "[a] time shall be set for a hearing not less than two and no more than fifteen calendar days after the student has been notified of the charges and their proposed dismissal from school"; "[t]he complainant (Administrator) and the respondent (Student) may present witnesses at the hearing"; "[a]fter the hearing, the Hearing Officer shall determine whether the student has violated the rules, regulations or policies that the student is charged with violating"; and the student may appeal to a University Conduct Committee that "will be comprised of staff and faculty members not involved in making the initial disciplinary decision" and that includes one student.

29. The Code defines the three charges on which Plaintiff was expelled. Section 2.1, "Abuse, Assault, and Threats," prohibits "[v]erbal abuse, assault, battery, or any other form of physical abuse of a student, University employee, community partner, or clinical partner" and "verbally or physically threatening any student, university guest, university employee, community partner, or clinical partner with physical or mental harm, damage to property, or other dangerous or intimidating behaviors." Section 4.2, "Disorderly Conduct," prohibits "[d]isruptive behavior that interferes with normal university operations." Section 4.5, "Incivility," provides that "[i]ntimidating, disrespectful, or unprofessional conduct is not tolerated."

30. The Handbook provides that "[r]egistration at South University, West Palm Beach implies the student's acceptance of the published academic regulations and all other rules found in any official publication or announcements."

31. The Handbook lists among the grounds for dismissal from the PA Program "[a] recommendation from the Dean of Student Affairs for violation of the University Code of Conduct" and "[f]ailure to achieve a grade of C or better . . . in any course, in any quarter." A dismissal resting on a Code of Conduct charge is therefore a PA Program dismissal subject to the three-level appeal (paragraph 27) and, under the Catalog, to review by the SPPC (paragraph 26).

32. The Handbook provides that "[s]tudents who are excused from the regularly scheduled administration of an assessment will be required to set up a time with the Course Director to make up the missed test as soon as possible"; that "[p]ermission for any deviation from the regular test schedule must be requested through" the Director of Didactic Education or the Director of Clinical Education; that whether a student with an unexcused absence may make up an examination at all — "for a maximum achievable grade of 70%" — lies within those Directors' discretion; and that "[a]ll evaluations not turned in and grades not calculated by the end of the rotation are reported as 'I' (Incomplete) to the Registrar's office."

33. The Handbook adopts accreditation Standard A3.19: "Student health records are confidential and must not be accessible to or reviewed by program, principal or instructional faculty or staff except for immunization and screening results, which may be maintained and released with written permission from the student."

34. The Handbook provides that students "reentering the program after an emergency leave will be subject to a reentry plan prescribed by the Student Progress and Promotions Committee and approved by the Program Director."

35. The Handbook's "Interpersonal Abilities" technical standard provides that "[a] student must possess the emotional health required for full utilization of his or her intellectual abilities, the exercise of good judgment, the prompt completion of all responsibilities required for the diagnosis and care of patients and the development of professionalism through mature, sensitive, and effective relationships with patients, families, and colleagues."

**B. Plaintiff's Disability and the University's Knowledge of It**

36. Plaintiff has major depressive disorder and a mood disorder, and she experiences panic attacks: episodes of acute physiological arousal marked by uncontrollable shaking, crying,

a racing heart, heavy breathing, a sense of doom, narrowed attention, disorganized thinking, and loss of control over her voice and movements. When active, these impairments substantially limit her thinking, concentrating, communicating, and sleeping and the operation of her neurological and endocrine functions. An impairment that is episodic is a disability if it would substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D).

37. In October 2024, Dr. Holz presented to Plaintiff's class — with Professor Spaulding present — a case in which a patient's lung had been punctured during a procedure performed for the first time. Plaintiff asked, in substance, how that was acceptable when the patient had not been told it was a first-time procedure. Her question went to patient safety and informed consent. Dr. Holz took no offense (paragraph 45); Professor Spaulding did.

38. On November 7, 2024, Plaintiff was called before an SPPC meeting chaired by Dr. Dawkins, with Professor Spaulding present, convened — its own minutes record — over "[e]xcessive tardiness" (three tardies, by the minutes' own count) and "an issue with an adjunct faculty member": Plaintiff's question to Dr. Holz, a matter already resolved with Dr. Holz himself before the meeting convened. Professor Spaulding pronounced that question "inappropriate" and told Plaintiff that she "need[ed] books on self-awareness" — a remark the committee's own minutes soften into a recommendation that Plaintiff "get a book on being an active listener." Dr. Dawkins warned Plaintiff that she "could be labeled as someone the doctors do not want to work with," told her that "everything in this meeting is confidential, and if anything is spread, it is because you said something," and added, "you know, we know people in the community." Five days later, Plaintiff sent Dr. Dawkins and Professor Spaulding a written apology promising "a lot more humility," to "speak less," and to "not share my unasked opinions."

39. Late that November, at a University Thanksgiving gathering, faculty who had not attended the meeting — including Professor Fidelia and Dr. Bishop — revealed in conversation with Plaintiff that they knew its details. Shortly after that exchange, during a break, Plaintiff suffered her first panic attack on campus, in the main lecture hall — hyperventilating, choking, her chest tight, gripped by a sense of doom — witnessed and assisted by at least six of her classmates.

40. Upon information and belief, Professor Spaulding and Dr. Dawkins are close friends of many years' standing and acted in concert in their dealings with Plaintiff, because they

convened and ran the November 2024 meeting together, conducted the October 17, 2025 review together (paragraph 68), and adopted and repeated one another's characterizations of Plaintiff throughout.

41. In early December 2024, Plaintiff began the University's disability-accommodation process, which Dr. Settles directed from Savannah. The University's Student Disability Support Services Welcome Packet, attached as Exhibit D, lists as documentable disabilities a "[d]iagnosis of anxiety, depression, bipolar, mood disorders," and similar psychological conditions.

42. The Welcome Packet promises: "All documentation in the student's file is treated confidentially and will not be released to anyone not involved in the accommodation process," subject to exceptions that do not apply here, and "Only the Dean of Student Affairs has direct access to student disability files." It defines disability-related documentation to include "psychological . . . evaluations; letters or other information from physicians; or medical records."

43. On December 11, 2024, the University issued an Accommodation Notification Letter, attached as Exhibit B. It certified that Plaintiff "has submitted the required documentation to substantiate the existence of a disability," approved extended time — time and a half — for her in-class quizzes, tests, and examinations, stated that "[t]he accommodations listed below MUST be provided to the student," declared its contents "CONFIDENTIAL," and remained "valid until December 11th, 2025."

44. On December 14, 2024, Plaintiff executed the University's Student Consent, Agreement for Accommodation & Acknowledgement of Responsibilities, dated December 11, 2024, attached as Exhibit C. In it the Office of Student Affairs states that it "is committed to providing reasonable accommodations when appropriate and, at the same time, respecting student privacy," and the agreement provides that "the School will not notify any instructor of my requests for accommodations unless and until I disclose my need for accommodations to the instructor(s)."

45. Dr. Holz counseled Plaintiff by personal email beginning in December 2024. After she wrote that she was "not sure there's much hope for recovering when it comes to getting on [Professor Spaulding's] good side," he advised that there was "ample time to get on her good side," and days later that he could "help mentor you guys to not make the same mistakes I made." On February 5, 2025, he wrote that when Plaintiff had questioned him in class, "Me,

standing in front of the room, didn't feel threatened or uncomfortable, etc. But Professor Spaulding took that as an insult." On February 6, Plaintiff confided a deeply personal family loss, wrote that she was "reacting more emotionally than usual," and described the "fear tactics and threats" of the November meeting. On February 8, Dr. Holz answered: "Whatever mentoring or help you need along the way I'm always available."

46. At 12:36 a.m. and 12:39 a.m. on February 20, 2025, without Plaintiff's consent, Dr. Holz forwarded both email chains to Program Director Diggins at her University account and to Professor Spaulding at a personal Gmail account, writing, "That's all I got for you guys." Upon information and belief, Professor Diggins and Professor Spaulding asked Dr. Holz for Plaintiff's correspondence, because his cover note states that he was sending what he had "got for" them and he sent it to both at the same time.

47. On February 21, 2025 — the day after the forward, and without knowing of it — Plaintiff asked Dr. Holz in writing that "the personal info I shared remain confidential," because "keeping this information private is important for my well-being." Dr. Holz replied on February 23, "I do not know what you are going through, but please take care of yourself," and on March 1 urged her to "lean on" Professor Diggins and Dr. Dawkins — without disclosing that he had already sent her confidences to Professor Diggins and to Professor Spaulding, the very faculty member about whom she had confided her difficulty. On March 4, 2025, Plaintiff agreed to continue corresponding "as long as my previous request is respected." Days later, when Dr. Holz arrived to lecture, Plaintiff asked him in person to keep her personal information from the University. He assured her that he would, that he was "just adjunct faculty" who "barely talk[ed]" with the program's faculty "except for Prof. Benlulu," and that he was "not about drama." Her confidences had been in the Program Director's and Professor Spaulding's hands for two weeks.

48. From February 20, 2025 forward, Professor Spaulding and Professor Diggins therefore knew from Plaintiff's own words that she was grieving and "reacting more emotionally than usual," and Professor Spaulding knew that Plaintiff had written of "fear tactics and threats" from Professor Spaulding and Dr. Dawkins.

49. On March 20, 2025, the SPPC — Professor Diggins, Dr. Dawkins, Professor Spaulding, and Desiree Hussain — met about Plaintiff. Its minutes state that she was "being brought to the SPPC committee for not meeting required program technical standards for

communication skills and interpersonal skills," quoting the Interpersonal Abilities standard's requirement of "emotional health," while recording that she sought leave "due to personal extenuating circumstances involving her emotional health." They call her score of 93 on the PACKRAT practice examination "lower; uncharacteristic academic performance" and direct that her final examinations be rescheduled "and be accommodated given her extenuating circumstances." The University thus treated the condition itself as a failure of its professional standards.

50. At that meeting Plaintiff requested an emergency leave of absence. On April 4, 2025, the Program Director approved an "emergency leave of absence and deceleration . . . due to extenuating personal circumstances involving your emotional health." At the Program Director's direction — given on May 5, 2025, with the instruction to "date this letter back to 03/24/25" — Plaintiff memorialized her request in a letter dated March 24, 2025 and sent on May 16, 2025, writing that she had been "navigating a period of emotional distress that has affected my mental health."

51. In late March 2025, Professor Diggins met with Plaintiff one-on-one about the leave. Plaintiff asked for a single rotation off, approximately five weeks; Professor Diggins told her the leave had to be three months. Professor Diggins then invited Plaintiff to share what was happening in her personal life and assured her that anything she disclosed would remain — in Professor Diggins' own word — "confidential." She did not disclose that she had been holding Plaintiff's confidences — the Holz forward — for the past month, even as she solicited more of them.

52. On May 5, 2025, Professor Diggins wrote to Plaintiff, copying Dr. Dawkins and Professor Spaulding, that because Plaintiff had "expressed significant distress" and taken leave, "we will need a clearance letter from a licensed medical provider . . . to indicate that you are cleared to return to the PA program," a letter required "to ensure that you're able to maintain the emotional health required to uphold the technical standards of the program." She directed that the letter come "to me," offering the Dean of Student Affairs only as an alternative.

53. On June 4, 2025, Plaintiff informed Professor Diggins that the University's contracted counseling provider, UWill, could not perform the clearance assessment, and she sent Professor Diggins the UWill record of her mental-health sessions.

54. On June 10, 2025, Dr. Dean wrote that, "[i]n line with university policy and expectations," she recommended monthly meetings — "I would appreciate if we could meet once a month to discuss your mental and physical progress as you continue in the program" — required documentation of Plaintiff's "mental health visits," and directed her to visit her primary care provider and "share your current mental health challenges with them."

55. Plaintiff accepted the monitoring, writing, "I'd welcome meeting monthly to discuss my physical and mental health progress," and attaching the UWill record of "the dates and attendance of my mental health sessions." On July 1, 2025, she sent Dr. Dean, copying Professor Diggins, her therapist's letter and the dates of her mental-health treatment. On July 3, 2025, Dr. Dean wrote: "Thank you for fulfilling the necessary requirements to rejoin the Physician Assistant program. . . . I will arrange a follow-up appointment for our monthly check-in starting next week."

56. The Re-entry Plan the University prescribed, dated June 4, 2025, required "proof of medical clearance reflecting stability of emotional health," "proof of ongoing routine support for emotional health," and "[r]outine monthly check-ins with the DoSA, Dr. Dean, to discuss emotional health and your ability to maintain the technical standard for Interpersonal abilities."

57. The University did not perform the monitoring it prescribed. Upon information and belief, the only check-in held before December 5, 2025 took place by video on July 8, 2025, because the University's production of Plaintiff's records reflects no other. On September 8, 2025, Dr. Dean asked to schedule a check-in; on September 15 she canceled it. None occurred in October or November — even after the SPPC, on November 4, 2025, made check-ins with Dr. Dean "[m]andatory." It was Plaintiff who, on November 19, 2025, asked Dr. Dean to schedule the check-in her Performance Improvement Plan required; the meeting was set for December 5, 2025 — the day of the examination, and the first check-in since July.

58. The University did not send Plaintiff the Re-entry Plan in June. On October 9, 2025, Professor Diggins wrote, "[d]ue to our own error, we did not send you your re-entry plan and should have in June," and asked Plaintiff to sign it because it showed that "you have met all the requirements to re-enter the program successfully." Plaintiff signed it on October 14, 2025.

59. On October 7, 2025, Plaintiff was diagnosed with a mood disorder and began antidepressant treatment. On October 28, 2025, her dose was doubled.

60. At 1:00 p.m. on October 8, 2025, Plaintiff asked Dr. Dean in writing for "all educational records related to my recent personal leave, including relevant emails, meeting notes, or any other documentation," writing that "[t]his request is simply for peace of mind and clarity," and adding, "I appreciate your discretion in handling this request." At 1:02 p.m., Dr. Dean — the only official with direct access to disability files — referred the request to Professor Diggins. By 3:06 p.m. that day, Professor Diggins had printed from her own mailbox the leave and clearance correspondence transmitting Plaintiff's therapist's letter and mental-health treatment records. At 2:05 p.m. the next day, she printed Dr. Holz's February 20 forward.

61. At 4:03 p.m. on October 9, 2025, Professor Diggins wrote to Plaintiff, copying Dr. Dean and Dr. Dawkins, that "you have remained in good academic standing in the PA program"; that emails "are not considered formal documentation or records"; that "there were no emails sent regarding your leave of absence beyond those you were included in already, unless they involved notification to leadership of your leave of absence, registration or financial aid follow up"; and that her supporting clearance and documentation "was sent to the DoSA, and remains confidential." Professor Diggins — who had directed that documentation to come "to me," had received and kept it, and had printed it from her own mailbox the previous afternoon — did not disclose the Holz forward she had printed two hours earlier.

62. By December 5, 2025, the University — through Dr. Dean, Professor Diggins, Dr. Dawkins, and Professor Spaulding — knew from its own records that Plaintiff had a psychiatric disability, had taken leave for it, had submitted her treatment records for it, was being monitored for it, and was vulnerable to acute stress reactions. At a minimum, it regarded her as having such an impairment.

**C. Plaintiff's Good Standing and the Federal Loan-Repayment Award**

63. On June 30, 2025 — her first day back after three months away from study — Plaintiff retook the PACKRAT practice examination and scored 111; the program's own score report put the national mean for students more than ten months from graduation at 117. That score was the sole stated basis for the first Performance Improvement Plan ("PIP"), which the SPPC issued on July 1, 2025 as, in its own words, "part of our commitment to supporting you throughout the clinical year." During that first PIP, Professor Solh — the Director of Student Success and Evaluation, whom the plan assigned to tutor Plaintiff — told Plaintiff that in her view Plaintiff did not need to be on a PIP.

64. Plaintiff's first two clinical rotations after her leave, Internal Medicine and Pediatrics — recorded on her transcript as Clinical Rotations 3 and 4 — earned her a B and an A, with end-of-rotation examination scores of 86.5 and 84.42 and preceptor evaluations of 86.07 and 98.62. On September 8, 2025, Dr. Dawkins, as her faculty advisor, recorded on the University's Clinical Advising Form that Plaintiff was "Meeting Expectation" in every program competency, including Professionalism and Interpersonal skills, and that she "continues to meet the expectations of her PIP."

65. On September 12, 2025, Professor Spaulding wrote to a prospective preceptor that "[t]his student has successfully completed her prior rotations" — while describing Plaintiff, at length and in advance, as one of the "students who may not be performing at the same level as their peers": "navigating some academic challenges," carrying "gaps in medical knowledge," "still building foundational skills" that "can slow down your workflow," and likely to "require more guidance and support than others."

66. On September 29, 2025, the SPPC notified Plaintiff that she had "met the parameters outlined in your PIP," including "[d]emonstrate professionalism in all communication, faculty interactions, and session attendance," and that the plan "will not continue."

67. On October 15, 2025, Plaintiff's Family Medicine preceptor completed her mid-rotation evaluation. Its "does not meet expectations" marks were confined to clinical categories; the categories covering professionalism, interpersonal skills, and communication were marked "meets expectations."

68. On October 17, 2025, Professor Spaulding and Dr. Dawkins met with Plaintiff to review that evaluation. Their own written log records that "she has successfully completed her IM and Pediatric rotations" and that her preceptors had found her "not meeting expectations in medical knowledge, clinical reasoning and problem solving skills, and discipline specific competencies" — all of them clinical skills. The same log then lists among the "identified areas of need" for remediation "interpersonal skills (including collaboration with healthcare professionals and patient interactions)" — an area no preceptor had identified, the meeting had not addressed, and the mid-rotation evaluation had marked as met.

69. On October 21, 2025, her Family Medicine preceptor reported that Plaintiff "continues to show improvement each day" and that "there aren't any specific clinical

knowledge gaps that stand out." Two days after that, the evaluator the program itself had assigned to Plaintiff's remediation, Jamie Mitnick, agreed to write Plaintiff a letter of recommendation for her National Health Service Corps application.

70. As of October 2025, Plaintiff's cumulative grade point average was 3.40, and she had never been charged with or found responsible for any violation of the University's Code of Conduct.

71. On October 27, 2025, Program Director Diggins executed a Verification of Good Standing to the United States Department of Health and Human Services certifying that Plaintiff was enrolled in the PA Program, in good standing, and anticipated to graduate on June 20, 2026.

72. That verification supported Plaintiff's application to the National Health Service Corps Students to Service Loan Repayment Program ("NHSC S2S LRP"), which repays up to $120,000 of a participant's educational loans in exchange for three years of primary-care service in a health professional shortage area. Plaintiff was selected for the Fiscal Year 2026 award. The program requires the participant to "[m]aintain enrollment as a full-time student, at an acceptable level of academic standing, until completion of his or her final year of a course of study in . . . physician assistant studies"; a dismissal from school defeats the award.

73. The University knew of the award, knew it depended on the University's own certification, and knew that a disciplinary expulsion and failing grades would destroy it.

**D. The Second PIP and the University's Own Words**

74. Plaintiff's third clinical rotation after her leave, Family Medicine (Clinical Rotation 5, September 29 to October 31, 2025), ended with a preceptor evaluation that praised her: "Student was eager to learn and demonstrated a positive attitude throughout the rotation," and her dietitian background "was a clear strength and added great value to her patient education, as she was able to communicate effectively about nutrition and lifestyle changes in a relatable way." Its criticisms concerned clinical reasoning, documentation, and chart review — matters of clinical skill — and it recognized "that this was only her third clinical rotation." Plaintiff passed the rotation's end-of-rotation examination on October 31, 2025.

75. On November 4, 2025, the SPPC placed Plaintiff on a second PIP. Its minutes state that "[f]ailing the preceptor evaluation constitutes a failed rotation"; that the Family Medicine rotation would be "[r]ecorded as an Incomplete" and "[m]ust be repeated"; that the committee "elected to remediate rather than dismiss"; that the Independent Study it prescribed

was "not . . . a punishment" but "[a]n opportunity to catch her up after time lost during her leave of absence"; and that check-ins with Dr. Dean for "support & academic monitoring" were "[m]andatory." The PIP added eleven components to Plaintiff's regular full-time clinical rotation and the independent study required to pass the end-of-rotation examination, among them two OSCEs (objective structured clinical examinations), assigned clinical cases, mentor meetings after each OSCE, preceptor follow-ups, mandatory check-ins with Dr. Dean and, separately, with Dr. Dawkins, and monitored attendance, deadlines, and communication.

76. The PIP charged Plaintiff with deficits in Interpersonal Skills (PLO 2) and Professionalism (PLO 6). The conduct-related items the SPPC recited — including a claimed direction about phone use that no one had given her — appear nowhere in the preceptor's written evaluation. The minutes attribute them to "faculty communication with both preceptors," and it was Professor Spaulding — the program's channel to its preceptors, who did not supervise Plaintiff clinically — who recited the phone-use claim to the committee. Upon information and belief, Professor Spaulding originated the interpersonal-skills and professionalism characterizations the committee adopted, because she was the faculty channel to the preceptors, because no preceptor wrote them, because she had already described Plaintiff to a preceptor, in advance, as not "performing at the same level as their peers" (paragraph 65), and because she had pressed the same themes since November 2024 (paragraph 38).

77. On October 28, 2025, Professor Spaulding told Plaintiff she would meet the program's evaluator, Jamie Mitnick, at Florida Atlantic University ("FAU") "at about noon" on October 30. Plaintiff asked to attend by video, citing a commute of "at least 2 hours round trip" the day before her examination; the program routinely met with her by video, including her PIP meetings, her advisor meetings with Dr. Dawkins, and Dr. Dean's July check-in. Eleven minutes later, Professor Spaulding required her to attend in person. On October 29, Plaintiff wrote, "I would appreciate at least 24 hours notice before the meeting"; at 3:04 p.m. that day, Professor Spaulding set the meeting for 12:15 p.m. the next day.

78. At the October 30 session, Professor Spaulding confronted Plaintiff for copying Ms. Mitnick on a scheduling email, accusing Plaintiff of going "above her head." During the session, Ms. Mitnick repeated Professor Spaulding's characterization of Plaintiff as struggling with interpersonal skills — though one week earlier Ms. Mitnick had agreed to write Plaintiff a recommendation letter, and the criticism came from Professor Spaulding, not from anything Ms.

Mitnick had observed. Plaintiff told Ms. Mitnick that it was Professor Spaulding who "really does not like" her, despite Plaintiff's attempts to repair the relationship.

79. At the November 4 meeting, Plaintiff asked that PIP expectations and logistics be given to her in writing through official channels; Professors Fidelia and Diggins agreed to email them but did not, and Plaintiff's written request to the Program Director that evening — asking her to confirm that everything considered against her had come "through official evaluation forms or documented channels" — went unanswered, as did the request for help and mentorship she sent to Dr. Bishop on November 9. The University agreed that Plaintiff's interactions with Professor Spaulding would be collective, not one-on-one, and Plaintiff asked that meetings concerning her be held with the full committee present.

80. On November 11, 2025, Dr. Dawkins wrote that the PIP Plaintiff had received "was missing details outlining the objectives, timelines, and expectations." The corrected objectives, sent at 7:56 p.m. that day, gave the first PIP OSCE a date — "week 2- Nov. 13" — but no time and no place. The first written communication giving the examination's time and place was sent at 9:21 p.m. on November 12 — "Tomorrow please arrive at FAU at 10:10" — about thirteen hours before it began. That evening Plaintiff had asked whether it would "be possible and fair to receive at least a 24-hour notice of the date and time." The University refused; the 9:21 p.m. message was its answer. She sat the OSCE on November 13 on less than a day's notice of its time and place and did not pass it; Jamie Mitnick, who proctored it, witnessed her distress.

81. On or about November 14, 2025, Plaintiff met with Professor Diggins and Dr. Dawkins and again asked for twenty-four hours' notice of examinations. In the portion of the meeting that became one-on-one, Dr. Dawkins remarked that Plaintiff had "shared something extremely personal with a physician." Plaintiff asked permission to speak honestly; then, raising her concern that her confidential information was circulating among faculty, she reminded Dr. Dawkins of the confidentiality promised at the November 2024 meeting. Dr. Dawkins answered that it "could have been one of the other faculty members." That afternoon, at 3:56 p.m., Plaintiff returned the signed PIP with a one-page addendum disputing its interpersonal and professionalism categories, and thanked Dr. Dawkins for listening to "my honest concerns."

82. On November 18, 2025, Plaintiff wrote that "there was significant miscommunication surrounding the msk OSCE, which made it difficult for me to adequately

prepare. I want to ensure clearer expectations moving forward so I can meet all the required competencies."

83. On November 19, 2025, Professor Diggins rejected the addendum as "not a formalized part of our process"; extended Plaintiff's graduation to September 2026; promised that the details and "exact time" of the second OSCE, set for December 4, would follow within a week; confirmed that the December 5 end-of-rotation examination "will be the end of the quarter expectations for you"; and directed that Plaintiff's communications go only to Professor Diggins, Dr. Dawkins, and Dr. Dean. She blind-copied Dr. Dean, Professor Spaulding, and three other faculty members.

84. Plaintiff also sought to arrange the separate check-in with Dr. Dawkins that her PIP required: on November 14, 2025 she asked Dr. Dawkins to let her know of "any next steps you'd like to schedule," on November 24 she asked to meet, and on November 26 she sent a reminder. That meeting, too, was set for December 5 — after the examination.

85. When the University finally gave Plaintiff what she had been asking for, she performed. Professor Fidelia sent complete written details for the second OSCE on November 28 and, at 9:55 a.m. on December 2, confirmed its time and place. With complete written logistics in hand two days ahead, Plaintiff sat the second OSCE on December 4, 2025, and performed well.

86. By December 5, 2025, Plaintiff had asked, in writing and in person, for written, official-channel communication of examination logistics and expectations, for at least twenty-four hours' notice of examinations, and for meetings with the full committee present. Given her leave, the re-entry monitoring, the treatment records it had demanded and kept, and the distress its proctor witnessed on November 13, the University knew that her difficulty with sudden, time-pressured uncertainty was bound up with her condition. Except for the second OSCE, it refused or ignored those requests.

**E. December 4 and 5, 2025**

87. At 3:17 p.m. on December 4, 2025, Professor Spaulding emailed Plaintiff, blind-copying two other students who tested with accommodations, that they must report by 8:15 a.m. the next morning, that late students "will be refused entry," and that a make-up examination carries a "maximum achievable grade" of 70% — a ceiling that, under the Handbook, lay in her own discretion as Director of Clinical Education (paragraph 32). Plaintiff replied at 3:24 p.m.: "As always, I will be on time." The University had last recorded Plaintiff tardy on March 12,

2025, nearly nine months earlier. The email was itself less than twenty-four hours' notice of the report time — from the program that had refused Plaintiff's request for twenty-four hours' notice of her examinations.

88. Plaintiff was the first student to arrive at the PA office on December 5, before 8:00 a.m. As she entered, Professor Spaulding asked her, "should I also get the door for you?" Professor Spaulding's own incident report concedes that Plaintiff "arrived before 8:15 am."

89. Professor Spaulding's December 4 email told the students testing with accommodations to "meet in the PA office by 8:15am and then we will move to your rooms with your proctors." It did not specify when the group would move, identify any testing room, or warn that a student who briefly stepped away would be left behind. The rest of the class always tests in the main lecture hall, a consistent and known location. The accommodated group, by contrast, had no fixed testing room; on earlier examinations, students had sometimes tested in the PA offices themselves. Students also routinely used the restroom before examinations without asking anyone's permission.

90. At about 8:21 a.m., Plaintiff stepped out to use the restroom. While she was gone, Professor Spaulding escorted the semi-private accommodated group and its proctor to a different room by the back hallway, telling only the students then present where they were going.

91. No one waited for Plaintiff or left word for her. The only notice was two text messages a classmate sent at 8:24 a.m. — "We going downstairs" and "Room to lecture hall" — neither of which identified a room. Plaintiff's phone was off, as the examination setting required, and she did not receive them. The University's reports nonetheless recite that the classmate had "texted her the room number."

92. Plaintiff returned to an empty office; no faculty member was present to tell her where her group had gone. Finding her group gone without a word, she felt the acute onset of sudden fear — the beginning of a panic attack. For the next several minutes she searched upstairs and downstairs for her testing room. Because she was herself a student testing with accommodations, and no one had told her which room had been assigned to her, she opened the doors of the rooms used for accommodated testing to find her own; each time she saw that a room was occupied by other students, she immediately closed the door and left. At 8:26 a.m., a staff member notified Professor Spaulding and Dr. Dawkins of Plaintiff's frantic search by text message.

93. Facing the prior afternoon's warning that a late student would be refused entry and capped at 70%, after weeks of unanswered requests for written, advance examination logistics, and unable to find anyone who could tell her where her examination was, the panic attack overwhelmed her.

94. Mallorie Williams, a University admissions representative, found Plaintiff in the upstairs hallway, distressed, pacing, and "visibly shaking while holding her laptop." Plaintiff asked for help finding her examination room and confirmed she had received no "written, verbal, or email communication regarding her testing location." Ms. Williams telephoned Professor Spaulding, who directed that Plaintiff be sent downstairs, where Professor Spaulding would meet her. In the grip of the attack — feeling targeted and unable to think past finding her room — Plaintiff repeatedly and loudly said that Professor Spaulding was "sabotaging" her.

95. Downstairs, when Professor Spaulding appeared in the hallway, Plaintiff — shaking and crying — told her that she had done this to her. Ms. Williams, standing in the same hallway, recorded that "Ruth was shaking, crying, and repeatedly shouting," that Professor Spaulding "attempted to calm her," and that Plaintiff answered, "I am not shouting, I am just very stressed now."

96. Professor Spaulding told Plaintiff that, "given her current level of distress, it was not advisable for her to take the exam." Plaintiff answered, "Of course not, I'm shaking!" Plaintiff did not sit her end-of-rotation examination that morning because a University official told her not to.

97. Clinical Coordinator Shana Swain-Halsall then came out of her office and, by her own account, told Plaintiff "to come inside my office now" — "to prevent further interaction with Prof. Spaulding and to also prevent further disruption in the hallway." Ms. Williams recorded that Ms. Swain-Halsall "instructed Ruth to come with her" and "escorted Ruth into the suite." Inside, Ms. Swain-Halsall recorded that Plaintiff was "crying uncontrollably and scratching her neck until it was red," was "crying and inconsolable," and "said she panicked." Asked later whether she could proceed with her examination that day, Plaintiff answered, "No, I feel overstimulated now." Ms. Swain-Halsall's report records Plaintiff crying that "Prof. Spaulding hates me and is sabotaging me!" — and records that, even mid-crisis, Plaintiff asked that other faculty or leadership be copied on all of her communications with Professor Spaulding going forward.

98. Another employee recorded that Plaintiff, knocking on a locked laboratory door and "appearing visibly distressed," was "unable to clearly articulate what had occurred."

99. While Plaintiff was in the office, Dr. Dawkins telephoned Ms. Swain-Halsall and instructed her, in Ms. Swain-Halsall's own words, "to keep Ruth in my office until she and Dr. Jocelyn Dean arrived." Ms. Swain-Halsall carried out that instruction. No one told Plaintiff she was free to go; the only instruction anyone gave about her was that she be kept. Plaintiff understood that she was not permitted to leave, and she did not leave until Dr. Dean, on arriving, told her to go eat and rest and to return to campus at 11:00 a.m.

100. The University's employees completed six incident-report forms about that morning. Each form offered "Medical" as a "Nature of Incident." Not one was marked "Medical": five were marked "Conduct," and the sixth — completed by the proctor of Room A213 — was marked nothing at all. That report records only that Plaintiff opened the door, "asked if it was the room she was supposed to be in," accepted the proctor's answer, "closed the door and left," and that the testing student "looked up briefly and then continued working."

101. No University employee summoned medical assistance, referred Plaintiff to disability services, or asked whether what they were watching was a manifestation of the condition the University had spent months monitoring.

102. Only one of the six reports contains the word "threat" — Professor Spaulding's — and even it does not assert that Plaintiff threatened anyone; it recounts only its author's claimed feeling. It states: "The situation continued to escalate, with Ruth yelling loudly and gesturing toward me while walking towards me. At that point, I felt threatened, feared for my safety, and began walking backwards toward the main hallway where thankfully Mallorie was standing." By that account, Ms. Williams stood in the hallway at the claimed retreat — and her report records Plaintiff shaking and crying and Professor Spaulding trying to calm her, with no advance and no retreat. No report records a threatening word, profanity, or physical contact.

103. What happened on December 5 was a medical crisis, triggered when the University moved an accommodated student's examination without telling her where it had gone.

**F. The Interim Suspension and the Predetermined Expulsion**

104. At the 11:00 a.m. meeting, Plaintiff told Dr. Dean that she had suffered a panic attack — a medical episode she had experienced on campus before.

105. At 1:15 p.m., Dr. Dean suspended Plaintiff by email, copying Dr. Settles and Nickeshia Bullock: "Effective immediately, and pending a full investigation into the incident that occurred today, December 5, 2025, you have been placed on interim suspension." The notice stated that "it is my responsibility to investigate your behavior during this incident," and it identified the charges as "Abuse, Assault and Threats, Disorderly Conduct, specifically regarding Incivility." Plaintiff was escorted off campus. No one assessed, on the basis of medical knowledge or objective evidence, whether she posed a risk to anyone.

106. At 2:10 p.m., Plaintiff wrote to Dr. Dean and six faculty members that "my body had a stress response," that "time sensitive situations can trigger an automatic physiological reaction," and that "my nervous system essentially went into overdrive."

107. Eleven minutes later, at 2:21 p.m., Dr. Dean directed Plaintiff to "refrain from sending any further direct communication to faculty, staff or instructors regarding this matter," invoking the need "[t]o ensure the neutrality and integrity of an open investigation."

108. At 1:47 p.m. on December 6, Plaintiff asked Dr. Dean whether her Women's Health end-of-rotation examination "is postponed or if I am expected to test on Monday." Seven minutes later, Dr. Dean replied that Plaintiff was "prohibited from contacting any faculty, staff, or students of the institution," could not come to campus "in any capacity," and should "refrain from sending any additional emails regarding this situation, as all necessary information has been thoroughly communicated to you." No one answered Plaintiff's question, and no one rescheduled her examination.

109. At 12:14 p.m. on December 6, 2025, Dr. Dawkins wrote to Program Director Diggins that Plaintiff's "badge access was revoked," that "we will need to work on packaging her files to send to leadership, which is what I will be going through this weekend," and that she had attached the University's Code of Conduct "and information regarding possible next steps" — although incident reports from two of the six employees were "still pending" and Dr. Dawkins acknowledged that she "did not witness the event directly." The same email records that Dr. Dawkins had "contacted Dr. Dean at 8:37 a.m." on December 5, while Plaintiff was being held in the clinical coordinator's office, and, "upon receiving Caitlin's email, forwarded the information to leadership at 10:07 a.m." — before the 11:00 a.m. meeting at which Dr. Dean first heard Plaintiff's account. The University then carried out the course Dr. Dawkins had announced: it

barred Plaintiff from campus "in any capacity" that weekend (paragraph 108), and Dr. Dawkins assembled Plaintiff's file over the following three days (paragraph 110).

110. The December 9 "hearing" notice did not begin the University's preparations; it concluded them. Between 4:26 and 4:47 a.m. that morning — more than seven hours before the notice announcing that Plaintiff had "been found responsible" — Dr. Dawkins printed from her own mailbox thirty-two pages of email concerning Plaintiff, a dozen separate threads reaching back to June 2024; the print stamps on the University's production show that she had begun printing the morning before, on December 8. The file against Plaintiff was assembled before her "hearing" was even scheduled.

111. At 11:59 a.m. on December 9, 2025, Dr. Dean emailed Plaintiff a notice setting a Code of Conduct hearing for 11:00 a.m. the next day, by videoconference — twenty-three hours after the notice, and less than the "not less than two . . . calendar days" the Code's own dismissal procedures require between written charges and the hearing (paragraph 28). The notice charged violations of Code sections 2.1, 4.2, and 4.5 but identified no time, place, or nature of any abuse, assault, or threat. Under the heading "Outcome," it stated that Plaintiff had "been found responsible for violating the Code of Conduct policies regarding Abuse, Assault and Threats, Disorderly Conduct, and Incivility." Under the heading "Recommended Sanctions (Effective Immediately)," it listed "Expulsion."

112. At 1:33 p.m., Plaintiff asked for the names of the people who had reported her, the exact incident being referenced, the specific Code provisions at issue, and the evidence against her, including the alleged "threat," "abuse," or "assault." She disclosed "a documented history of strong physiological stress reactions under certain academic conditions" and asked to bring a support person.

113. At 1:47 p.m., Dr. Dean listed "[t]he exact incident being referenced" both among the information she said had been provided and among the information she withheld — although the Code of Conduct requires the charges to state "the time, place and nature of the alleged offense(s)" (paragraph 28). She refused to identify the reporters or to provide their statements "[f]or the protection of third-party rights," "noting the nature of the Code of Conduct violations." She permitted "one person (family member, friend, etc.) as an observer" and wrote that "[t]he student may not be accompanied by an attorney." She did not respond to Plaintiff's disclosure. At 2:18 p.m., the University sent Plaintiff five incident reports with the reporters' names redacted —

five of the six its employees had completed. It withheld the sixth — the proctor's account of a calm exchange — and first disclosed it in its production of Plaintiff's records dated October 13, 2026. The copy of Professor Benlulu's report it sent omitted that report's "Impact" paragraph, which the University first disclosed in 2026.

114. On December 10, Dr. Dean conducted the hearing alone, by videoconference, and stated — as Plaintiff's support person witnessed — that the hearing was being recorded; no recording appears in the University's production of Plaintiff's records. At the hearing, Plaintiff explained, again, that what had happened on December 5 was a panic attack, and denied that she had abused, assaulted, or threatened anyone. At 6:24 p.m., Dr. Dean issued a Student Conduct Resolution expelling Plaintiff "[i]n the best interests of the health, safety, and welfare of the University community," barring her from campus, and warning that "[a]ny attempt to enter the premises will result in you being subject to arrest for trespassing." The University thus imposed its most severe sanction — permanent expulsion, enforced by a threat of arrest — on a student with no disciplinary history, after being told repeatedly that the episode was a panic attack, and without any individualized assessment of whether she posed a risk to anyone.

115. The University never referred the December 5 episode to the SPPC — the body to which, under the Catalog's Physician Assistant Code of Conduct, "[a]ll Code of Conduct violations will be reported" for consideration of "the student's suitability for continued participation in the program" (paragraph 26) — and the SPPC never considered it. Dr. Dean, who had suspended Plaintiff, investigated her, announced the finding, and conducted the hearing, decided alone.

**G. The Appeal the University Refused to Provide**

116. On December 13, 2025 — within three business days of the Resolution — Plaintiff appealed in writing to Dr. Dean, copying Ms. Bullock. She wrote that "[t]he episode involved acute physiological distress consistent with a panic response, rather than intentional misconduct," invoked "Disability-Related Considerations (ADA / Section 504)," and asked the University to determine "whether reasonable accommodations, medical leave, or alternative interventions should have been explored prior to dismissal." She noted that the reports document "observable distress and disruption" but no threats, hostile language, physical contact, or refusal to comply.

117. Under the Handbook and the Catalog's Physician Assistant Program Progression Policy (paragraph 27), an appeal of a PA Program dismissal resting on a Code of Conduct violation goes to the Department Chair, then to the Assistant Dean of the College of Health Professions, and then to the Dean of the College of Health Professions, whose decision is final. None of those officials decided Plaintiff's appeal.

118. Instead, the University routed Plaintiff's appeal into a University Conduct Committee process coordinated by Dr. Dean — the official who had investigated, pre-announced the finding, conducted the hearing, and imposed the sanction. After a December 18 hearing, Dr. Settles wrote on December 19, 2025 that "the committee has decided to uphold the original decision of expulsion" and that "there is no further appeal action that can be taken." The decision stated no reasons and did not address the disability grounds Plaintiff had raised.

119. The University also treated Plaintiff's December 13 appeal only as a conduct appeal. Although it alleged disability discrimination in writing to the campus Dean of Student Affairs — the official the Enrollment Agreement and the Catalog designate to receive discrimination complaints and to coordinate the University's compliance (paragraphs 24 and 25) — Dr. Dean did not invoke the Catalog's Student Grievance Procedure, no one investigated the discrimination allegation, and no written findings on it were ever issued.

120. Plaintiff's December 13 appeal was itself timely under the Handbook's three-business-day rule; the University received it and never forwarded it to the Department Chair. On January 3, 2026, Plaintiff expressly invoked the Handbook's appeal to the Department Chair and the College of Health Professions. On January 5 and 6, Dr. Settles responded that the decision was "final." Dr. Dean directed Plaintiff to "cease further contact with me and other university personnel regarding this case."

121. On January 5, 2026, Dr. Dean sent Plaintiff an email asserting — for the first time — that Plaintiff should not have used the restroom in the ten to fifteen minutes before her December 5 examination, a requirement stated in no University policy, and referring to her use of the word "sabotage." Dr. Dean then recalled the email, and when Plaintiff asked at 12:45 p.m. that it be re-sent, it never was. Neither matter was a charge Plaintiff had been told she faced.

**H. The Failing Grades**

122. After expelling Plaintiff, the University recorded failing grades for Clinical Rotation 5 (Family Medicine) and Clinical Rotation 6 (Women's Health), reducing her

cumulative grade point average from 3.40 to 2.94. The University's own written chronology of Plaintiff's enrollment, furnished through its counsel in January 2026, records that she was "Placed on Academic Warning 12/17/2025" — four days after she appealed her expulsion on express disability grounds and the day before her appeal hearing — and lists the failing grades and the 2.94 average. Plaintiff learned of the grades in early February 2026.

123. Plaintiff's Rotation 6 preceptor gave her a final evaluation score of 91.02, finalized on December 4, 2025 — the day before the episode — and attesting to "no deficits"; the University never showed it to her. The failing grade rests solely on the end-of-rotation examination that Professor Spaulding told Plaintiff not to take and that the University then refused to reschedule — contrary to the Handbook's make-up and Incomplete provisions.

124. Upon information and belief, Professor Spaulding assigned both failing grades, because the Handbook vests the Director of Clinical Education with "final authority in assigning grades for all the clinical rotations and courses" and with control over whether a missed examination may be made up, including the 70% ceiling on any make-up it permits (paragraph 32).

125. Plaintiff passed the Rotation 5 end-of-rotation examination on October 31, 2025, and the SPPC had resolved that Rotation 5 would be recorded as an Incomplete and repeated under a remediation plan. The University recorded an F instead.

**I. The Harvesting and Disclosure of Plaintiff's Confidential Information**

126. The University repeatedly broke its confidentiality commitments to Plaintiff. In November 2024, faculty who had not attended Plaintiff's SPPC meeting — a meeting Dr. Dawkins had pronounced "confidential" — learned its details (paragraph 39).

127. In February 2025, the Program Director (Professor Diggins) and the Director of Clinical Education (Professor Spaulding) obtained from Dr. Holz — an emergency physician and adjunct faculty member — Plaintiff's confidential correspondence with him (paragraphs 45 through 48): her grief, her emotional state, and her candid account of her difficulty with Professor Spaulding, whom she had approached personally "to help better understand her expectations," hoping "to mend what's needed," without success. Plaintiff did not learn of the forward until the University produced it in 2026.

128. From May through July 2025, the Program Director directed that Plaintiff's mental-health clearance letter be sent "to me" and received Plaintiff's mental-health treatment

records and her therapist's letter — health records that Standard A3.19 forbids program faculty to access and disability-related documentation that the Welcome Packet reserves to the Dean of Student Affairs. On October 8, 2025, she printed those records from her own mailbox.

129. When Plaintiff asked Dr. Dean for her leave records — records of her mental-health treatment — Dr. Dean passed the request to the Program Director within two minutes, and the Program Director's answer omitted the Holz forward she had printed that afternoon (paragraphs 60 and 61).

130. On or about November 14, 2025, Dr. Dawkins referred to what Plaintiff had "shared" with "a physician" (paragraph 81). The confided correspondence itself recorded that Dr. Dawkins had made a comment "that felt like it was still hanging over my head"; in invoking the disclosure, Dr. Dawkins held Plaintiff's own sensitive disclosure over her head. Upon information and belief, Dr. Dawkins learned of Plaintiff's private correspondence with Dr. Holz from Professor Diggins or Professor Spaulding, because both held it; because Professor Diggins printed it on October 9 and that day copied Dr. Dawkins on her answer to Plaintiff's records request; and because Dr. Dawkins raised the disclosure five weeks later.

131. Plaintiff consented to none of these disclosures. To the contrary, she asked four times that her information be kept confidential: in writing on February 21, 2025, March 4, 2025, and October 8, 2025, and in person in early March 2025 (paragraphs 47 and 60).

**J. Plaintiff's Protected Activity and the University's Responses**

132. Plaintiff requested accommodation for her disability, and opposed discrimination on the basis of it, on these occasions: (a) in December 2024, she requested, and thereafter used, the testing accommodations the University approved by a letter certifying that she had substantiated "the existence of a disability" (paragraphs 41 through 43); (b) in March 2025, she requested leave for her emotional health, and from May through July 2025 she submitted the mental-health documentation the University demanded as the condition of her return (paragraphs 50 through 55); (c) on or about November 14, 2025, she objected that her confidential information was circulating among faculty (paragraph 81); (d) at 11:00 a.m. on December 5, 2025, she told Dr. Dean that she had suffered a panic attack (paragraph 104); (e) at 2:10 p.m. that day, she explained in writing that her body had had a stress response (paragraph 106); (f) on December 9, she disclosed her history of stress reactions and asked for a support person (paragraph 112); (g) on December 13, she appealed her expulsion expressly under the ADA and

Section 504 (paragraph 116); and (h) on January 3, 2026, she invoked the Handbook's appeal (paragraph 120).

133. The University's responses followed within minutes, hours, and days. It suspended Plaintiff less than three hours after she told Dr. Dean the episode was a panic attack; forbade her, eleven minutes after she explained her stress response, from communicating with faculty; announced her expulsion four days later in the notice setting her hearing; expelled her the day after she disclosed her history and asked for support; rejected her disability-based appeal without addressing it; placed her on academic warning and recorded failing grades after that appeal; and directed her to cease contact after she invoked the Handbook's appeal. Dr. Dean and Dr. Settles, who made the suspension, expulsion, and appeal decisions, knew of Plaintiff's protected activity when they acted.

**K. Damages and Continuing Harm**

134. As a direct result of the University's conduct, Plaintiff lost the professional degree she had substantially completed; the approximately $118,000 in tuition and fees she paid for it, financed with federal loans she must still repay with interest; and approximately $60,000 in living and related expenses of her enrollment.

135. Plaintiff lost the NHSC S2S LRP award, worth up to $120,000 in loan repayment.

136. Plaintiff lost the difference between what she would have earned as a physician assistant and what she can earn as a registered dietitian, her occupation since 2019 — a difference estimated to exceed $1,750,000 over her working life.

137. Plaintiff's academic record falsely reflects a disciplinary expulsion for abuse, assault, and threats and two failing clinical grades, impairing her ability to gain admission to any other physician-assistant program.

138. Plaintiff's psychiatric treatment intensified: she began cognitive-behavioral therapy on December 15, 2025, and continued psychiatric care and medication in 2026. She has incurred, and will incur, the cost of that treatment.

139. Plaintiff has suffered severe emotional distress, mental anguish, humiliation, and loss of the capacity for the enjoyment of life.

140. Plaintiff's exclusion is a continuing, present injury. As of the filing of this Complaint, the expulsion, the campus bar, the disciplinary finding and notation, the failing grades, and the denial of her accommodated December 5 examination all remain in force, and the

University continues to refuse the reinstatement Plaintiff sought in her December 13, 2025 appeal and her January 3, 2026 invocation of the Handbook's dismissal appeal. Plaintiff remains ready to resume her clinical year, intends to return to the PA Program and complete her degree immediately upon reinstatement, and remains subject to the same policies and the same decision-makers. Her reasons are concrete: she stands months from the degree she has paid for and substantially completed; her career — including the three years of federal primary-care service her NHSC award contemplated (paragraph 72) — depends on it; and the false disciplinary record the University created impairs her admission to any other physician-assistant program (paragraph 137), leaving completion at South University her only practical path. Plaintiff is deterred from setting foot on campus solely by the University's bar and its threat of arrest, and any further request for readmission would be a futile gesture under 42 U.S.C. § 12188(a)(1): the University has told her that its decision is "final," that "there is no further appeal action that can be taken," and that she must cease contact (paragraphs 118 and 120).

## CLAIMS FOR RELIEF

### COUNT I

**Disability Discrimination — Exclusion and Denial of Equal Participation**

**ADA Title III, 42 U.S.C. § 12182(a), (b)(1)(A)(i)–(ii)**

**(Against South University–Florida and South University–Savannah)**

141. Plaintiff incorporates paragraphs 4 through 13, 24 through 73, 87 through 125, and 140.

142. Plaintiff is an individual with a disability under 42 U.S.C. § 12102(1): she has mental impairments that, when active, substantially limit major life activities; she has a record of them; and the University regarded her as having them (paragraphs 36 through 62).

143. The University owns and operates the PA Program, a place of public accommodation under 42 U.S.C. § 12181(7)(J).

144. Plaintiff was qualified to continue: she was "Meeting Expectation" in every program competency, carried a 3.40 grade point average, and had been certified to the United States as enrolled in good standing six weeks before her expulsion (paragraphs 64, 66, 70, and 71).

145. The University excluded Plaintiff from the PA Program, and denied her the full and equal enjoyment of its services, on the basis of her disability: it suspended, charged, expelled, barred, and failed her for the involuntary manifestations of a documented panic attack, recorded a medical episode as "Conduct," and expelled her for the community's "health, safety, and welfare" (paragraphs 92 through 98, 100, 104 through 106, and 114).

146. The University had long treated the condition itself as a failure of its professional standards (paragraphs 49, 52, and 56).

147. Its stated reason — "Abuse, Assault and Threats" — is pretext: its own reports describe a student in medical crisis; the only claim of threat is Spaulding's account of her own fear, which the eyewitness she placed in the hallway does not corroborate; and the University announced the finding and the sanction before any hearing and denied Plaintiff the appeal its Handbook required (paragraphs 102, 111 through 113, and 117 through 120).

148. But for her disability, Plaintiff would not have been suspended, expelled, barred from campus, or failed.

149. Plaintiff's exclusion is a continuing, present injury: the expulsion, campus bar, disciplinary notation, and accommodation denial remain in force, and Plaintiff intends to return immediately upon reinstatement and faces a real and immediate threat of the same treatment by the same decision-makers (paragraph 140). She seeks injunctive relief under 42 U.S.C. § 12188(a)(2) and reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; she seeks no damages under this Count.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah for injunctive relief reinstating her in the PA Program; rescinding the interim suspension, the expulsion, and the campus bar; expunging the disciplinary finding and notation; and replacing the Clinical Rotation 5 and 6 grades with Incompletes to be completed on reinstatement; for reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; and for such further relief as the Court deems just and proper.

**COUNT II**

**Failure to Make Reasonable Modifications**

**ADA Title III, 42 U.S.C. § 12182(b)(2)(A)(ii)**

**(Against South University–Florida and South University–Savannah)**

150. Plaintiff incorporates paragraphs 4 through 13, 24 through 125, and 140.

151. Plaintiff is an individual with a disability, and the University operates a place of public accommodation, as alleged in paragraphs 7 and 36 through 62. Plaintiff proceeds on the actual-disability and record-of-impairment prongs; this Count does not rest on the "regarded as" prong.

152. Plaintiff requested, and the University knew she needed because of her disability, these modifications of its policies, practices, and procedures: (a) administration of her December 5, 2025 examination under her approved accommodations, with notice of where the accommodated group was testing, and a make-up once she was told not to test; (b) treatment of her panic attack as a disability-related medical episode, as she asked on December 5 and December 9; (c) medical leave, a monitored return, or remediation in place of expulsion, as her December 13 appeal asked; (d) the monthly emotional-health check-ins the University itself had prescribed; and (e) written, advance examination logistics — including notice of any change in an examination's time or place — and twenty-four hours' notice of examinations.

153. The University knew each modification was disability-based: it had approved her accommodations, granted her leave for her emotional health, and imposed emotional-health monitoring on her return; it was told on December 5 that she had suffered a panic attack and on December 9 that she had a documented history of physiological stress reactions; and it learned on December 5 that the attack was not her first, Plaintiff having suffered one on campus in late November 2024 in front of her classmates.

154. Each modification was reasonable and would not have fundamentally altered the PA Program. The University had already granted each kind: rescheduled examinations "given her extenuating circumstances," an emergency leave, meetings by video, rotations recorded as Incompletes, and — for the second OSCE — written logistics in advance, after which Plaintiff performed well. None would have lowered any academic or clinical standard.

155. The University refused each modification and, by refusing, excluded Plaintiff from the PA Program.

156. Plaintiff's exclusion and the denial of her modifications are continuing, present injuries, and she intends to return immediately upon reinstatement (paragraph 140). She seeks injunctive relief under 42 U.S.C. § 12188(a)(2) and reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; she seeks no damages under this Count.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah for injunctive relief reinstating her; requiring the University to administer her examinations under her approved accommodations with written, advance notice of logistics; rescinding the expulsion and campus bar; expunging the disciplinary finding; and replacing the Clinical Rotation 5 and 6 grades with Incompletes; for reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; and for such further relief as the Court deems just and proper.

**COUNT III**

**Discriminatory Eligibility Criteria**

**ADA Title III, 42 U.S.C. § 12182(b)(2)(A)(i)**

**(Against South University–Florida and South University–Savannah)**

157. Plaintiff incorporates paragraphs 4 through 13, 24 through 62, 70, 87 through 121, and 140.

158. Plaintiff is an individual with a disability, and the University operates a place of public accommodation, as alleged in paragraphs 7 and 36 through 62.

159. The University imposed and applied eligibility criteria that screen out, or tend to screen out, students with psychiatric disabilities: it treated "emotional health" as a technical standard, brought Plaintiff before the SPPC "for not meeting required program technical standards" when the condition surfaced, conditioned her return on proof of "stability of emotional health," and then treated the symptoms of her disability as "Abuse, Assault and Threats," "Disorderly Conduct," and "Incivility" (paragraphs 49 through 56 and 105 through 114).

160. Those criteria, as applied to Plaintiff, were not necessary to the provision of the PA Program's services: the University could have evaluated her against its clinical and professional requirements without treating the involuntary manifestations of her disability as disqualifying.

161. Safety did not make those criteria necessary. A public accommodation may exclude an individual on safety grounds only if she poses a direct threat — a significant risk to the health or safety of others that modifications cannot eliminate — determined through an individualized assessment based on reasonable judgment relying on current medical knowledge or the best available objective evidence. 42 U.S.C. § 12182(b)(3); 28 C.F.R. § 36.208. This

Count asserts a single claim under 42 U.S.C. § 12182(b)(2)(A)(i); the absence of any such assessment is alleged because it shows that the criteria the University applied were not necessary.

162. The University excluded Plaintiff "[i]n the best interests of the health, safety, and welfare of the University community," barred her from campus under threat of arrest, and withheld her accusers' identities "noting the nature of the Code of Conduct violations" — treating her as dangerous — without any such assessment: it sought no medical input, disregarded the explanations she gave on December 5 and December 9, and relied on a single report of subjective fear that the eyewitness in the same hallway does not corroborate (paragraphs 102 and 104 through 114).

163. Plaintiff posed no direct threat: no report records a threatening word or physical contact; she followed every direction she was given that morning; and she had no disciplinary history of any kind.

164. Plaintiff's exclusion is a continuing, present injury, and she intends to return immediately upon reinstatement (paragraph 140). She seeks injunctive relief under 42 U.S.C. § 12188(a)(2) and reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; she seeks no damages under this Count.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah for injunctive relief rescinding the expulsion and campus bar, reinstating her, expunging the disciplinary finding, and enjoining the University from excluding her on safety grounds without an individualized assessment under 28 C.F.R. § 36.208; for reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; and for such further relief as the Court deems just and proper.

**COUNT IV**

**Retaliation**

**Americans with Disabilities Act, 42 U.S.C. § 12203(a)**

**(Against South University–Florida and South University–Savannah)**

165. Plaintiff incorporates paragraphs 4 through 13, 24 through 35, 41 through 43, 50 through 55, 81, 87 through 125, 132, 133, and 140.

166. Plaintiff engaged in protected activity on each occasion listed in paragraph 132. Each was a request for accommodation or opposition to disability discrimination that she reasonably and in good faith believed unlawful.

167. The University took materially adverse action against Plaintiff because of that activity: the interim suspension, the pre-announced finding of responsibility, the expulsion, the rejection of her disability-based appeal without addressing it, and the academic warning and failing grades that followed that appeal (paragraph 133).

168. The decision-makers — Dr. Dean and Dr. Settles — knew of Plaintiff's protected activity when they acted, and the adverse actions followed it within hours and days.

169. The retaliatory suspension, expulsion, campus bar, and failing grades remain in force (paragraph 140). Plaintiff seeks the injunctive relief available under 42 U.S.C. §§ 12203(c) and 12188(a)(2) and reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; she seeks no damages under this Count.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah for injunctive relief rescinding the suspension, expulsion, campus bar, disciplinary finding, and retaliatory grades, reinstating her, and enjoining further retaliation; for reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; and for such further relief as the Court deems just and proper.

**COUNT V**

**Coercion, Intimidation, Threats, and Interference**

**Americans with Disabilities Act, 42 U.S.C. § 12203(b)**

**(Against South University–Florida and South University–Savannah)**

170. Plaintiff incorporates paragraphs 4 through 13, 24 through 29, 104 through 121, and 140.

171. The University coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of her rights under the ADA, and on account of her exercise of them. It (a) forbade her, eleven minutes after she explained her disability-related stress response, from communicating with faculty about it; (b) the next day forbade her from contacting any faculty member, staff member, or student and refused to answer whether her examination was postponed; (c) threatened her with arrest for trespassing; (d) forbade her to bring counsel to the hearing at which it expelled her; and (e) directed her to cease all contact after she invoked the Handbook's appeal and the disability grounds she had raised.

172. The exclusion those acts produced remains in force (paragraph 140). Plaintiff seeks the injunctive relief available under 42 U.S.C. §§ 12203(c) and 12188(a)(2) and reasonable

attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; she seeks no damages under this Count.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah for injunctive relief rescinding the no-contact directives and campus bar and enjoining further coercion and interference; for reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12205; and for such further relief as the Court deems just and proper.

**COUNT VI**

**Disability Discrimination**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

**(Against South University–Florida and South University–Savannah)**

173. Plaintiff incorporates paragraphs 4 through 13, 20, 21, 24 through 73, 87 through 125, 134 through 138, and 140.

174. Plaintiff is an individual with a disability under 29 U.S.C. § 705(20)(B), for the reasons alleged in paragraphs 36 through 62.

175. Plaintiff was otherwise qualified to continue in the PA Program, as alleged in paragraphs 64, 66, 70, and 71.

176. The University receives federal financial assistance, including through the Title IV student-aid programs and its disbursement of federal Direct Loans to Plaintiff, and the PA Program is part of a program or activity receiving that assistance (paragraphs 20 and 21).

177. The University excluded Plaintiff from participation in, denied her the benefits of, and subjected her to discrimination in the PA Program solely by reason of her disability: the only conduct for which it suspended, expelled, barred, and failed her was the involuntary manifestation of her disability, and its stated reason is pretext, as alleged in paragraphs 87 through 120.

178. The University acted intentionally, or at a minimum with deliberate indifference. Dr. Dean — the official the Enrollment Agreement designates "to handle inquiries and coordinate the institution's compliance efforts" on disability discrimination, with authority over accommodations and the Code of Conduct — knew of Plaintiff's psychiatric disability from her leave and re-entry file, prescribed monthly emotional-health monitoring, was told on December 5 that the episode was a panic attack, and received her written explanations of December 5 and

December 9; she chose to suspend, pre-announce responsibility, and expel. When Plaintiff's December 13 appeal put a written complaint of disability discrimination in her hands, she neither investigated it under the Catalog's Student Grievance Procedure nor issued findings on it (paragraph 119). Dr. Settles — who directed Plaintiff's accommodations and issued the decision on an appeal that expressly invoked the ADA and Section 504 — chose to affirm without addressing it. Professor Diggins, the Program Director, knew of the disability and took no corrective action. Each had authority to correct the discrimination and deliberately declined to do so.

179. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 138: tuition and fees, the NHSC award, lost and delayed earnings, loan interest, and the cost of her treatment. She seeks compensatory economic damages, nominal damages, and injunctive and declaratory relief under 29 U.S.C. § 794a(a)(2), and reasonable attorney's fees and costs under 29 U.S.C. § 794a(b).

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory economic damages; nominal damages; injunctive relief reinstating her, rescinding the expulsion and campus bar, expunging the disciplinary finding, and replacing the Clinical Rotation 5 and 6 grades with Incompletes; declaratory relief; reasonable attorney's fees and costs under 29 U.S.C. § 794a(b); pre- and post-judgment interest; and such further relief as the Court deems just and proper.

## COUNT VII
## Failure to Accommodate
## Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 34 C.F.R. § 104.44
## (Against South University–Florida and South University–Savannah)

180. Plaintiff incorporates paragraphs 4 through 13, 20, 21, 24 through 125, 134 through 138, and 140.

181. Plaintiff is an otherwise qualified individual with a disability, and the University receives federal financial assistance, as alleged in paragraphs 21, 36 through 62, 64, 66, 70, and 71. Plaintiff proceeds on the actual-disability and record-of-impairment prongs; this Count does not rest on the "regarded as" prong.

182. The University approved Plaintiff's accommodations in writing, declared that they "MUST be provided," and kept them in force through December 11, 2025 (paragraph 43).

On December 5, 2025, it failed to provide them: it moved the accommodated testing group without notice to Plaintiff, then — through its Director of Clinical Education — told her not to test, never rescheduled the examination, and recorded a failing grade on the strength of it.

183. The University also refused the modifications Plaintiff requested from December 5 through December 13 — consideration of her disability, medical leave, a monitored return, or remediation — abandoned the emotional-health monitoring it had prescribed as the condition of her return, and refused her requests for written, advance examination logistics.

184. Each accommodation was reasonable, as the University's own prior grants of each kind confirm, and none would have lowered any academic or clinical standard.

185. Dr. Dean and Dr. Settles knew that Plaintiff's accommodations had not been provided and that she had asked for consideration of her disability, and each had authority to provide it. Dr. Dean, the designated compliance official, received that request as a written discrimination complaint on December 13 and never invoked the procedure the Catalog prescribes for it (paragraph 119). Each deliberately chose not to.

186. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 138. She seeks compensatory economic damages, nominal damages, and injunctive and declaratory relief under 29 U.S.C. § 794a(a)(2), and reasonable attorney's fees and costs under 29 U.S.C. § 794a(b).

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory economic damages; nominal damages; injunctive relief reinstating her with her approved accommodations and replacing the Clinical Rotation 5 and 6 grades with Incompletes; declaratory relief; reasonable attorney's fees and costs under 29 U.S.C. § 794a(b); pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT VIII**

**Retaliation**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 34 C.F.R. §§ 104.61 and 100.7(e)**

**(Against South University–Florida and South University–Savannah)**

187. Plaintiff incorporates paragraphs 4 through 13, 20, 21, 24 through 35, 41 through 43, 50 through 55, 81, 87 through 125, 132 through 138, and 140.

188. The University receives federal financial assistance (paragraph 21).

189. Plaintiff engaged in protected activity on each occasion listed in paragraph 132.

190. The University took materially adverse action against Plaintiff because of that activity: the interim suspension, the communication bans, the pre-announced finding, the expulsion, the rejection of her appeal, the failing grades, and the directive to cease contact, each following her protected activity within minutes, hours, or days and each imposed by decision-makers who knew of it (paragraph 133).

191. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 138. She seeks compensatory economic damages, nominal damages, and injunctive and declaratory relief under 29 U.S.C. § 794a(a)(2), and reasonable attorney's fees and costs under 29 U.S.C. § 794a(b).

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory economic damages; nominal damages; injunctive relief rescinding the retaliatory actions and reinstating her; declaratory relief; reasonable attorney's fees and costs under 29 U.S.C. § 794a(b); pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT IX**

**Declaratory Judgment**

**28 U.S.C. §§ 2201–2202**

**(Against South University–Florida and South University–Savannah)**

192. Plaintiff incorporates paragraphs 4 through 13, 20 through 73, 87 through 125, and 140.

193. An actual, substantial, and continuing controversy exists between Plaintiff and the University over the validity of the expulsion, the campus bar, the disciplinary finding, and the failing grades, all of which remain in force and injure Plaintiff every day, and the University continues to refuse her unresolved request for reinstatement.

194. Plaintiff is entitled to a declaration that (a) the expulsion, the disciplinary finding, and the campus bar violate Title III of the ADA and Section 504 and are void; (b) the University breached the parties' contract by denying Plaintiff the Handbook's and the Catalog's dismissal appeal and the Code of Conduct's hearing procedures; and (c) the failing grades for Clinical Rotations 5 and 6 violate the Handbook's make-up and Incomplete provisions and the SPPC's own resolution and must be replaced with Incompletes.

195. Plaintiff is also entitled under 28 U.S.C. § 2202 to further relief directing the University to correct her academic and disciplinary records and to transmit the corrected status to any person or agency to which it reported the expulsion, including the United States Department of Health and Human Services.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah declaring the rights of the parties as set out in this Count; granting further relief under 28 U.S.C. § 2202; awarding costs; and granting such further relief as the Court deems just and proper.

**COUNT X**

**Breach of Contract — Dismissal and Appeal Procedures**

**(Against South University–Florida and South University–Savannah)**

196. Plaintiff incorporates paragraphs 4 through 8, 13, 20 through 35, 70, 104 through 121, 134 through 137, and 140.

197. Plaintiff and the University are parties to a written contract: the Enrollment Agreement, which incorporates the Catalog, together with the Handbook, whose published rules Plaintiff accepted by registering, and under which Plaintiff paid tuition and agreed to abide by the University's rules and the University agreed to provide her education and to follow its published rules (paragraphs 22 through 30). In the alternative, the same terms form an implied-in-fact contract between Plaintiff and the University.

198. The contract included the dismissal-appeal terms of the Handbook and of the Catalog's Physician Assistant Program Progression Policy, under which a PA Program dismissal resting on "Code of Conduct violations" is appealable to the Department Chair, the Assistant Dean, and the Dean of the College of Health Professions, whose decision "is final" (paragraphs 27 and 31); and the Catalog's Physician Assistant Code of Conduct, under which "[a]ll Code of Conduct violations will be reported to the Student Progress and Promotions Committee" (paragraph 26).

199. The contract also included the procedural protections the Code of Conduct promises before a student is expelled — "due process as outlined herein," written charges stating "the time, place and nature of the alleged offense(s)," a hearing "not less than two" calendar days after notice of the charges, the right to "present witnesses at the hearing," a determination made "[a]fter the hearing," and review by a committee "not involved in making the initial disciplinary

decision" (paragraph 28) — together with the protections the University's own notices promised: an investigation completed before any determination, notice of the charges and evidence, and a hearing at which responsibility would be decided (paragraphs 105 and 111).

200. Plaintiff performed her obligations. She paid her tuition, met the program's academic and clinical standards, and timely appealed in writing within three business days of her expulsion.

201. The University breached the contract by (a) never affording Plaintiff review by the Department Chair, the Assistant Dean, or the Dean of the College of Health Professions; (b) declaring the committee decision its Assistant Vice Chancellor announced "final" and announcing that "there is no further appeal action that can be taken"; (c) refusing Plaintiff's January 3, 2026 invocation of the Handbook appeal; (d) announcing that Plaintiff had "been found responsible" and would be expelled in the very notice that set her hearing, before any investigation of her account and before she was heard — a result its Assistant Program Director had been preparing since December 6, 2025 (paragraphs 109 and 110); (e) setting the hearing twenty-three hours after notice of the charges, in violation of the Code's two-calendar-day minimum; (f) refusing to state the time, place, and nature of any abuse, assault, or threat, and withholding the identities and statements of the employees whose reports it relied on; and (g) never referring the matter to the SPPC as the Catalog's Physician Assistant Code of Conduct requires (paragraphs 111, 113, 115, and 117 through 120).

202. These breaches concern specific procedural promises, not academic judgment. Each promise is mandatory on its face — "must," "shall," "will result in referral" — and none is stated as optional or as an alternative to another. Plaintiff's expulsion was disciplinary, and the University's departures from its own rules — substituting for the Handbook's three-level appeal a shorter process of its own devising, coordinated by the official who had already announced the result — were arbitrary, capricious, and in bad faith.

203. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 137. Plaintiff also seeks specific performance: reinstatement and the Handbook appeal she was denied.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; specific performance

reinstating her and affording her the Handbook's dismissal appeal; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XI**

**Breach of Contract — Accommodation and Confidentiality Terms**

**(Against South University–Florida and South University–Savannah)**

204. Plaintiff incorporates paragraphs 4 through 8, 13, 22 through 25, 33, 39 through 48, 52 through 55, 60, 61, 81, 87 through 96, 108, 116 through 119, 122, 123, 126 through 131, 134 through 137, and 140.

205. Plaintiff and the University were parties to the contract alleged in paragraphs 22 and 23, which included these specific terms: (a) that Plaintiff's accommodations "MUST be provided" and that the Accommodation Notification Letter is "CONFIDENTIAL" (Exhibit B; paragraph 43); (b) the Accommodation Agreement's commitments to "respecting student privacy" and not to notify instructors of her accommodation requests unless she disclosed them (Exhibit C; paragraph 44); (c) the Welcome Packet's commitments that disability documentation "will not be released to anyone not involved in the accommodation process" and that "[o]nly the Dean of Student Affairs has direct access to student disability files" (Exhibit D; paragraph 42); (d) Standard A3.19, under which student health records "must not be accessible to or reviewed by program, principal or instructional faculty or staff" (paragraph 33); and (e) the Non-Discrimination Policy and Student Grievance Procedure — reasonable accommodations, no retaliation, and "a fair, prompt and reliable determination" of a discrimination complaint (paragraphs 24 and 25).

206. Plaintiff performed her obligations, including submitting the documentation the University required.

207. The University breached those terms: it (a) failed to provide Plaintiff's accommodations for her December 5, 2025 examination — moving the accommodated group without notice to her, telling her not to test, and never rescheduling; (b) had the Program Director demand, receive, keep, and print Plaintiff's mental-health treatment records and therapist's letter; (c) routed Plaintiff's request for her own leave records from the Dean of Student Affairs to the Program Director; and (d) never investigated, determined, or answered Plaintiff's written December 13, 2025 complaint of disability discrimination under the Student Grievance

Procedure, and instead affirmed her expulsion without addressing it and entered failing grades against her (paragraphs 119 and 122).

208. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 137, including the failing grade recorded for the examination the University failed to accommodate, and at a minimum nominal damages. Plaintiff also seeks specific performance: replacement of the Rotation 6 grade with an Incomplete and administration of the examination under her accommodations.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory and nominal damages; specific performance as described in this Count; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XII**

**Breach of Contract — The Re-entry Plan**

**(Against South University–Florida and South University–Savannah)**

209. Plaintiff incorporates paragraphs 4 through 8, 13, 22, 23, 34, 50 through 58, 75, 87 through 114, 134 through 137, and 140.

210. The Re-entry Plan the University prescribed under the Handbook, and that Plaintiff signed at its request on October 14, 2025, required "[r]outine monthly check-ins with the DoSA, Dr. Dean, to discuss emotional health." Dr. Dean confirmed the commitment in writing on June 10 and July 3, 2025, and the SPPC made those check-ins "[m]andatory" on November 4, 2025.

211. Plaintiff performed every condition of the plan. Dr. Dean confirmed on July 3, 2025 that she had fulfilled "the necessary requirements to rejoin the Physician Assistant program," and the Program Director confirmed on October 9, 2025 that she had "met all the requirements to re-enter the program successfully."

212. The University breached the plan. It held one check-in, in July 2025; canceled the September check-in; held none in October or November, even after the plan was signed and the SPPC made the check-ins mandatory; and first set the next check-in for December 5, 2025 — after the examination. Then, instead of the support the monitoring existed to provide, it disciplined and expelled Plaintiff for the very emotional-health episode the plan was designed to anticipate.

213. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 137. Plaintiff also seeks specific performance: reinstatement under the Re-entry Plan.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; specific performance reinstating her under the Re-entry Plan; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XIII**

**Breach of Contract — PIP, Progression, and Grading Terms**

**(Against South University–Florida and South University–Savannah)**

214. Plaintiff incorporates paragraphs 4 through 8, 13, 22, 23, 32, 66, 74, 75, 83, 96, 108, 122 through 125, 134 through 137, and 140.

215. The contract included the Handbook's make-up and Incomplete provisions (paragraph 32) and the SPPC's November 4, 2025 resolution, made under the Handbook's progression rules, that Clinical Rotation 5 would be "[r]ecorded as an Incomplete" and repeated under a remediation plan rather than dismissal (paragraph 75).

216. The University breached those terms. It recorded an F for Clinical Rotation 5 in place of the Incomplete its committee had resolved to record, and it recorded an F for Clinical Rotation 6 on the strength of an examination its Director of Clinical Education told Plaintiff not to take, which it then refused to reschedule, instead of providing a make-up and reporting an Incomplete.

217. These grades are not academic judgments. They are departures from specific, ministerial terms of the contract.

218. As a direct result, Plaintiff's grade point average fell from 3.40 to 2.94, and she suffered the economic losses alleged in paragraphs 134 through 137. Plaintiff also seeks specific performance replacing those grades with Incompletes.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; specific performance replacing the Clinical Rotation 5 and 6 grades with Incompletes; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XIV**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Pleaded in the Alternative to Counts X through XIII)**

**(Against South University–Florida and South University–Savannah)**

219. Plaintiff incorporates paragraphs 4 through 8, 13, 22 through 35, 74 through 125, 134 through 137, and 140.

220. Every contract includes an implied covenant that each party will exercise the discretion the contract gives it in good faith and not to defeat the other party's reasonable expectations.

221. The parties' contract gave the University discretion over the design and scheduling of Plaintiff's PIP requirements, the logistics of her examinations, the classification of campus incidents and the imposition of interim measures, the conduct of her disciplinary hearing, and the recording of her grades.

222. The University exercised that discretion arbitrarily, capriciously, and in bad faith to defeat Plaintiff's expectation of completing her degree. It gave Plaintiff less than a day's written notice of the time and place of the first OSCE under her PIP and refused her request for twenty-four hours' notice; set her expulsion hearing twenty-three hours after notice of the charges; relayed the room change for an accommodated examination through a classmate's text message; classified a documented medical episode as "Conduct"; announced the finding and sanction in the notice setting the hearing, making the hearing a formality; and failed her for an examination it had told her not to take and a rotation it had resolved to treat as Incomplete.

223. This Count rests on the University's exercise of discretion that the contract grants but does not specify, and it is pleaded in the alternative to Counts X through XIII to the extent the conduct alleged is found not to breach an express term.

224. As a direct result, Plaintiff suffered the economic losses alleged in paragraphs 134 through 137.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XV**

**Promissory Estoppel**

**(Pleaded in the Alternative to Counts X through XIV)**

**(Against South University–Florida and South University–Savannah)**

225. Plaintiff incorporates paragraphs 4 through 8, 13, 22 through 35, 41 through 44, 54 through 58, 66, 71 through 75, 83, 87 through 129, 134 through 137, and 140.

226. This Count is pleaded in the alternative, to the extent the University disputes that the promises described below — in its Handbook, its accommodation documents, the Re-entry Plan, the SPPC's resolutions, and its Program Director's written commitments — are enforceable contract terms.

227. The University made clear and definite promises to Plaintiff: that her accommodations "MUST be provided" (paragraph 43); that her disability documentation would not be released beyond the accommodation process and that "[o]nly the Dean of Student Affairs" would have direct access to it (paragraph 42); that she would have monthly check-ins with the Dean of Student Affairs to discuss her emotional health (paragraphs 54 through 56); that Clinical Rotation 5 would be recorded as an Incomplete and repeated under remediation rather than dismissal (paragraph 75); that a dismissal could be appealed to the Department Chair, the Assistant Dean, and the Dean of the College of Health Professions (paragraph 27); that a student facing expulsion would receive written charges stating the time, place, and nature of the offense and a hearing not less than two calendar days later (paragraph 28); and that the December 5 examination would be "the end of the quarter expectations" for her (paragraph 83).

228. The University expected, and should reasonably have expected, Plaintiff to rely on those promises. She did: she remained enrolled and paid tuition, disclosed her disability and submitted her mental-health records, completed every re-entry and PIP requirement, and pursued and was selected for the NHSC S2S LRP award in reliance on her continued enrollment.

229. The University broke each of those promises (paragraphs 57, 90 through 96, 111, 113, 117 through 120, 122, 123, and 127 through 129), and injustice can be avoided only by enforcing them. As a direct result of her reliance, Plaintiff suffered the losses alleged in paragraphs 134 through 137.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for damages measured by her reliance; enforcement

of the promises, including reinstatement; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XVI**
**Unjust Enrichment**
**(Pleaded in the Alternative to Counts X through XV)**
**(Against South University–Florida and South University–Savannah)**

230. Plaintiff incorporates paragraphs 4 through 8, 13, 20, 36, 87 through 125, and 134 through 137.

231. This Count is pleaded in the alternative, to the extent the University disputes that an enforceable contract governs its subject matter.

232. Plaintiff conferred a benefit on the University: approximately $118,000 in tuition and fees.

233. The University knew of, accepted, and retained that benefit.

234. It would be inequitable for the University to retain the benefit while withholding the degree it was paid to provide, through an expulsion imposed for the manifestation of Plaintiff's disability, without the process its own rules required.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for restitution of the benefit conferred; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XVII**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201 et seq.**
**(Against South University–Florida and South University–Savannah)**

235. Plaintiff incorporates paragraphs 4 through 8, 13, 20, 22, 23, 27, 28, 31, 33, 41 through 44, 52 through 55, 60, 61, 111 through 114, 116 through 120, 126 through 131, and 134.

236. The University engages in trade or commerce under Fla. Stat. § 501.203(8) by advertising, offering, and providing educational services for tuition, and Plaintiff is a consumer of those services.

237. The University committed deceptive acts: (a) the Welcome Packet its Office of Student Affairs gave Plaintiff in December 2024, in the accommodation process Dr. Settles

directed from Savannah (Exhibit D; paragraphs 41 and 42), represented that "[o]nly the Dean of Student Affairs has direct access to student disability files" and that disability documentation "will not be released to anyone not involved in the accommodation process," while the University's practice was to route students' emotional-health documentation to program faculty, as it did with Plaintiff's from February through October 2025 (paragraphs 127 and 128); (b) the 2025–2026 Handbook and the Catalog represented that a dismissal for "Code of Conduct violations" carries a three-level appeal (paragraph 27) — an appeal the University then denied; (c) the Code of Conduct represented that a student facing expulsion "will be accorded due process as outlined herein," including written charges stating the time, place, and nature of the offense and a hearing "not less than two" calendar days after notice (paragraph 28) — process the University withheld (paragraphs 111 and 113); and (d) on October 9, 2025, in answer to Plaintiff's written request for her own records, its Program Director represented by email that "there were no emails sent regarding your leave of absence beyond those you were included in already" — two hours after printing from her own mailbox the Holz forward of Plaintiff's confidences, an email chain Plaintiff had never been included in (paragraphs 60 and 61). Each representation was likely to mislead a consumer acting reasonably.

238. The University committed unfair practices: it expelled a paying student through a "hearing" whose notice had already announced the finding and the sanction, and it retained her full tuition while withholding her degree through that process — practices that offend established public policy and are unethical, oppressive, and substantially injurious to consumers.

239. As a direct result, Plaintiff suffered actual damages: the difference between the value of the educational services as represented — with confidential disability handling and a three-level dismissal appeal — and the value of the services delivered, which ended in an expulsion without either.

240. Plaintiff is entitled to actual damages under Fla. Stat. § 501.211(2), declaratory and injunctive relief under Fla. Stat. § 501.211(1), and reasonable attorney's fees and costs under Fla. Stat. § 501.2105.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for actual damages; declaratory and injunctive relief; reasonable attorney's fees and costs under Fla. Stat. § 501.2105; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XVIII**

**Negligent Misrepresentation**

**(Against South University–Florida and South University–Savannah)**

241. Plaintiff incorporates paragraphs 4 through 8, 13, 22, 33, 41 through 55, 60, 61, 102 through 114, 126 through 131, and 134 through 137.

242. The University made representations of existing fact to Plaintiff: the Welcome Packet its Office of Student Affairs gave her in December 2024 (Exhibit D) stated that "[o]nly the Dean of Student Affairs has direct access to student disability files" and that "[a]ll documentation in the student's file is treated confidentially and will not be released to anyone not involved in the accommodation process," and its Handbook stated, in Standard A3.19, that student health records "must not be accessible to or reviewed by program, principal or instructional faculty or staff."

243. Those statements were false when made. Upon information and belief, the University's practice was to route students' emotional-health and disability documentation to program faculty, because in February 2025 its Program Director and its Director of Clinical Education obtained Plaintiff's emotional-health confidences through a faculty back channel (paragraphs 46 and 127); because in May 2025 the Program Director directed Plaintiff's clearance letter to come "to me" as a matter of course and received and kept her mental-health treatment records and therapist's letter; and because the SPPC's program faculty reviewed her emotional-health circumstances in March 2025.

244. The University made the statements without knowledge of their truth or falsity, or should have known of their falsity, because they described its own practices.

245. The University intended the statements to induce students, including Plaintiff, to disclose their disabilities and submit disability and health documentation, and Plaintiff justifiably relied on them: in reliance on the Welcome Packet's representations, she submitted supporting documentation to the Office of Student Affairs in December 2024 and obtained accommodations; and in reliance on those representations and Standard A3.19, she submitted her mental-health treatment records and her therapist's letter between May and July 2025 — records she would not otherwise have placed within reach of the program faculty who evaluated, disciplined, and reported on her. The University gained her continued enrollment, her tuition, and the documentation it demanded.

246. As a direct result, Plaintiff's confidential information was placed in the hands of the faculty who treated her emotional-health condition as a professional deficiency and whose reports were later used to expel her for its manifestation, and she suffered the economic losses alleged in paragraphs 134 through 137.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XIX**

**Tortious Interference with an Advantageous Business Relationship**

**(Against South University–Florida and South University–Savannah)**

247. Plaintiff incorporates paragraphs 4 through 8, 13, 71 through 73, 87 through 125, and 135.

248. Plaintiff had an advantageous business relationship with the National Health Service Corps and the United States Department of Health and Human Services, under which she had been selected for a Fiscal Year 2026 loan-repayment award of up to $120,000 in exchange for three years of primary-care service.

249. The University knew of the relationship; its Program Director certified Plaintiff's good standing to the federal agency to support it.

250. The University is a stranger to the relationship. It is not a party to it, receives nothing under it, and would have had no role in Plaintiff's federal service.

251. The University intentionally and without justification interfered with the relationship by expelling Plaintiff on a pretextual, predetermined charge, refusing every alternative that would have preserved her enrollment, and recording failing grades that eliminated her standing, knowing that destruction of the relationship was the substantially certain result. Even if the University were deemed not a stranger to the relationship, it used improper means and acted from a purely malicious motive.

252. As a direct result, the relationship was terminated, and Plaintiff lost the award, worth up to $120,000.

253. The University's conduct was intentional misconduct that supports an award of punitive damages; its managing agents — the Dean of Student Affairs and the Assistant Vice Chancellor for Student Success — actively and knowingly participated in it.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XX**

**Tortious Interference with a Contractual Relationship**

**(Against Caitlin Spaulding, Individually)**

254. Plaintiff incorporates paragraphs 4 through 9, 22 through 32, 37, 38, 45 through 48, 63 through 78, 87, 88, 96, 108, 120, 122 through 125, and 134 through 137.

255. Plaintiff had a contract with the University, express or implied in fact (paragraphs 22 and 23), under which she was entitled, among other things, to have her clinical rotations graded under the Handbook and the SPPC's resolutions and to pursue reinstatement through the Handbook's dismissal appeal, which she invoked on January 3, 2026 (paragraphs 27, 32, and 120).

256. Spaulding, the Director of Clinical Education responsible for Plaintiff's clinical year, knew of that contract.

257. Upon information and belief, Spaulding assigned Plaintiff failing grades for Clinical Rotations 5 and 6 after the expulsion, while Plaintiff was pursuing reinstatement, because the Handbook vests her position with final authority over clinical grades and over whether a missed examination may be made up (paragraph 124).

258. Spaulding thereby intentionally and without justification interfered with Plaintiff's contract with the University. The grades defy the University's own rules and resolutions — the SPPC had resolved that Rotation 5 be recorded as an Incomplete and repeated, and the Handbook required a make-up and an Incomplete for the Rotation 6 examination Spaulding herself told Plaintiff not to take — and they cut Plaintiff's grade point average from 3.40 to 2.94, creating under the Handbook's "C or better" rule an independent academic ground for dismissal: a second barrier to reinstatement that stands even if the disciplinary expulsion is set aside (paragraphs 31 and 122 through 125).

259. Spaulding acted outside the authority the University gave her and against its interests. The University charged her with grading rotations on the preceptors' evaluations; she failed a rotation whose preceptor scored Plaintiff at 91.02 and a rotation the University's own

committee had resolved to treat as Incomplete. The grades served no interest of the University; they defied its committee and its Handbook.

260. Spaulding used improper means — grades that misstate Plaintiff's clinical performance and defy the SPPC's resolution and the Handbook — and, independently, her sole motive was ill will toward Plaintiff, as shown by the facts alleged in paragraphs 37, 38, 45 through 48, 65, 76, 78, 87, and 88.

261. This Count rests on Spaulding's grading conduct, not on the incident report that is the subject of Count XXI.

262. As a direct result, Plaintiff lost the academic standing on which her reinstatement and her federal loan-repayment award depended, and she suffered the economic losses alleged in paragraphs 134 through 137.

263. Spaulding acted from malice and engaged in intentional misconduct, entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff demands judgment against Caitlin Spaulding for compensatory damages; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXI**

**Defamation Per Se**

**(Against Caitlin Spaulding, Individually)**

264. Plaintiff incorporates paragraphs 4 through 9, 28, 32, 37 through 40, 45 through 49, 52, 65 through 69, 76 through 79, 81, 83, 87 through 105, 111 through 114, 118, 123, 124, and 134 through 139.

265. On December 5, 2025, Spaulding wrote and submitted to the University's Dean of Student Affairs an incident report, marked "Conduct," containing the statement quoted in paragraph 102: that Plaintiff was "yelling loudly and gesturing toward me while walking towards me," and that Spaulding "felt threatened, feared for my safety, and began walking backwards toward the main hallway where thankfully Mallorie was standing."

266. The report asserts as fact that Plaintiff advanced on Spaulding while gesturing at her and that Spaulding retreated from her toward another employee — physical events that can be proven true or false.

267. By pairing that claimed advance with fear and a retreat toward "where thankfully Mallorie was standing," while omitting that the employee standing there saw Spaulding trying to calm a shaking, crying student, the report conveys that Plaintiff physically menaced a faculty member — the substance of an assault.

268. The statements and their implication are false. Plaintiff did not advance on, threaten, or endanger Spaulding. Ms. Williams — whom Spaulding's own report places in the hallway at that moment — recorded Plaintiff "shaking, crying" and Spaulding attempting "to calm her," with no advance and no retreat; none of the other five reports records any threat (paragraphs 95 and 102).

269. The report names Plaintiff. Spaulding published it to Dr. Dean and, upon information and belief, knew and intended that it would be republished to Dr. Settles and the University Conduct Committee — a body that, by the Code of Conduct's own terms, includes a student member, a recipient outside the University's management (paragraph 28) — because the Code of Conduct appeal procedure required them to review the finding the report was used to support. The report was no good-faith communication made in the course of any duty; Spaulding made it for her own purposes.

270. The statements are defamatory per se: they impute to a physician-assistant student preparing for a licensed profession in patient care conduct incompatible with that profession — physically menacing a faculty member — and tend to subject her to distrust, contempt, and disgrace. Because Spaulding is not a media defendant, malice and damages are presumed.

271. Spaulding knew the statements were false or made them with reckless disregard for their truth: moments earlier she had herself told Plaintiff that, "given her current level of distress," she should not take her examination. She knew Plaintiff was in visible medical distress, not menacing anyone.

272. Any qualified privilege is defeated by express malice: Spaulding's primary motive was to injure Plaintiff, as these facts show. (a) Since February 20, 2025, she had held — at a personal email account — Plaintiff's private emails recounting Plaintiff's unsuccessful efforts to repair their relationship and describing the "fear tactics and threats" Plaintiff met from Spaulding and Dr. Dawkins (paragraphs 45 through 48). (b) She had taken as "an insult" Plaintiff's classroom question about patient safety — a question its own target said left him neither "threatened" nor "uncomfortable" — and pronounced it "inappropriate" (paragraphs 37, 38, and

45). (c) She described Plaintiff to a prospective preceptor, in advance and at length, as academically deficient, and seeded the program's evaluator with her "interpersonal skills" characterization, though that evaluator had just agreed to write Plaintiff a recommendation (paragraphs 65, 69, and 78). (d) She accused Plaintiff of going "above her head" for copying that evaluator on an email (paragraph 78). (e) Plaintiff's November 14 addendum disputed PIP categories built on the "faculty communication" Spaulding had relayed, after the University had agreed that Plaintiff's interactions with Spaulding would be collective, not one-on-one (paragraphs 76, 79, 81, and 83). (f) On December 4 she sent Plaintiff — last recorded tardy nine months earlier — a warning that late students would be refused entry and capped at a 70% make-up ceiling that lay in her own discretion, and on December 5 she greeted Plaintiff with "should I also get the door for you?" (paragraphs 32, 87, and 88). (g) She alone of six reporters claimed a threat, and the eyewitness she herself placed in the hallway contradicts her (paragraph 102). (h) After the expulsion she assigned Plaintiff both failing grades, one resting solely on the examination she had told Plaintiff not to take (paragraphs 123 and 124).

273. Spaulding's report was the only basis for the charge of "Abuse, Assault and Threats," which the University imposed within five hours, pre-announced as a finding four days later, and used to expel Plaintiff. As a direct result, Plaintiff suffered injury to her reputation, the loss of her education and of the NHSC award, lost earning capacity, emotional distress, mental anguish, and humiliation, as alleged in paragraphs 134 through 139, together with presumed damages.

274. Spaulding acted with actual malice and engaged in intentional misconduct, entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff demands judgment against Caitlin Spaulding for compensatory damages, including presumed damages and damages for injury to reputation, emotional distress, mental anguish, and humiliation; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

## COUNT XXII

## Defamation Per Se

## (Against South University–Florida and South University–Savannah)

275. Plaintiff incorporates paragraphs 4 through 13, 28, 29, 87 through 114, 116 through 118, and 134 through 139.

276. The University published two sets of false and defamatory statements about Plaintiff. First, on December 5, 2025, Professor Spaulding, acting within the course and scope of her employment, wrote and submitted to Dr. Dean the incident report quoted in paragraph 102, which is false and defamatory for the reasons alleged in paragraphs 95 and 102; the University is liable for that statement of its employee.

277. Second, the University's December 9, 2025 notice and December 10, 2025 Resolution, both issued by Dr. Dean, stated that Plaintiff had "been found responsible for violating the Code of Conduct policies regarding Abuse, Assault and Threats" and expelled her for the community's "health, safety, and welfare" (paragraphs 111 and 114). Upon information and belief, the University published those statements to Dr. Settles and to the members of the University Conduct Committee — including the student member the Code of Conduct places on that committee, who is no officer or manager of the University (paragraph 28) — because its appeal procedure required them to review the finding and they did so.

278. Those statements convey, and were intended to convey, that Plaintiff abused, assaulted, or threatened a University employee. That is false: Plaintiff suffered a panic attack and threatened no one.

279. The statements are defamatory per se because they impute to a physician-assistant student conduct incompatible with the practice of her profession and tend to subject her to distrust, contempt, and disgrace.

280. The statements were not good-faith communications made in the discharge of any duty, and any qualified privilege is defeated by express malice. The University announced the finding before any hearing; refused to identify the accusers or disclose their statements; disregarded Plaintiff's medical explanation, given repeatedly; relied on a single report of subjective fear that the eyewitness did not corroborate; and denied Plaintiff the appeal its Handbook required.

281. As a direct result, Plaintiff suffered the injuries alleged in paragraphs 134 through 139, together with presumed damages.

282. The University's managing agents — its Dean of Student Affairs and its Assistant Vice Chancellor for Student Success — made, approved, or ratified the statements with actual malice, entitling Plaintiff to punitive damages against the University.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages, including presumed damages and damages for injury to reputation, emotional distress, mental anguish, and humiliation; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXIII**

**Intentional Infliction of Emotional Distress**

**(Against South University–Florida and South University–Savannah)**

283. Plaintiff incorporates paragraphs 4 through 13, 36 through 62, 81, 87 through 121, 126 through 131, and 134 through 139.

284. This Count rests on the University's own course of conduct. It does not rest on the publication of the statements that are the subject of Counts XXI and XXII, nor on the detention that is the subject of Counts XXIV and XXV.

285. The University acted intentionally or recklessly. Knowing that Plaintiff had a psychiatric disability, was in active treatment and under its own monitoring, and had just suffered an episode its employees described as leaving her "inconsolable," "visibly shaking," and "scratching her neck until it was red," the University: (a) recorded the episode as "Conduct" and summoned no medical help; (b) suspended her within hours of being told it was a panic attack and had her escorted off campus; (c) forbade her — eleven minutes after she explained her condition — from communicating with faculty, and the next day from contacting anyone at the University; (d) announced her expulsion before her hearing, withheld her accusers and their statements, and barred counsel; (e) expelled her under threat of arrest; (f) raised with her, one-on-one, the matter she had confided to a physician — knowing that privacy in that matter was important to her well-being; and (g) gathered her private correspondence and mental-health records into the hands of the program faculty who evaluated her.

286. That course of conduct was an abuse of the University's position of authority over a student it knew to be psychiatrically vulnerable and peculiarly susceptible to emotional distress — authority over her degree, her profession, and her presence on campus — and it was outrageous, beyond all bounds of decency, and utterly intolerable in a civilized community. The University knew the harm it would cause: its Student Conduct Resolution told Plaintiff to "seek

out appropriate external professional assistance to manage the emotional impact of this outcome."

287. The conduct caused Plaintiff severe emotional distress, as alleged in paragraphs 138 and 139.

288. The University's conduct was intentional misconduct that supports an award of punitive damages; its managing agents — the Dean of Student Affairs and the Assistant Vice Chancellor for Student Success — actively and knowingly participated in it.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXIV**

**False Imprisonment**

**(Against South University–Florida and South University–Savannah)**

289. Plaintiff incorporates paragraphs 4 through 13, 87 through 105, and 139.

290. On December 5, 2025, University employees directed Plaintiff — a student in visible medical crisis — into Ms. Swain-Halsall's office, and Dr. Dawkins, the Assistant Program Director, then instructed Ms. Swain-Halsall "to keep Ruth in my office until she and Dr. Jocelyn Dean arrived," and Ms. Swain-Halsall did so (paragraphs 97 and 99).

291. Plaintiff was restrained by the words and asserted authority of the officials who controlled her enrollment. She was told to come into the office "now," held there on the instruction of the Assistant Program Director, never told she was free to go, and released only when the Dean of Student Affairs arrived and released her. Plaintiff understood that she was not permitted to leave, and she did not leave.

292. The restraint was against Plaintiff's will. She did not consent to being held for the administrators who, within hours, would charge and suspend her.

293. The University had no legal authority, and no color of legal authority, to detain Plaintiff. Its employees are not law-enforcement officers, and no law authorized them to confine a student.

294. The restraint was unreasonable and unwarranted by the circumstances. Plaintiff had committed no offense and posed no threat to anyone, and the University's own employees were documenting that she was shaking, crying uncontrollably, and inconsolable. The University

did not hold her to obtain care — it summoned none. It held her for the officials who began its disciplinary response that same day (paragraphs 100, 101, 104, and 105).

295. Plaintiff was aware of the restraint and was harmed by it. Confinement in the middle of an acute panic attack, waiting for the administrators who controlled her future, prolonged and compounded the episode.

296. Dr. Dawkins and Ms. Swain-Halsall acted within the course and scope of their employment.

297. The University's conduct was intentional and supports an award of punitive damages; its Assistant Program Director, who directed the detention, and its Dean of Student Affairs, who ratified it on arrival by continuing to hold Plaintiff to a return time rather than releasing her unconditionally, are managing agents who actively and knowingly participated in it.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXV**

**False Imprisonment**

**(Against Kimberly Dawkins, Individually)**

298. Plaintiff incorporates paragraphs 4 through 8, 10, 13, 87 through 105, and 139.

299. On December 5, 2025, Dawkins telephoned the clinical coordinator who had taken Plaintiff into her office and instructed her "to keep Ruth in my office until she and Dr. Jocelyn Dean arrived." The coordinator did as Dawkins directed (paragraphs 97 and 99). Dawkins thus directed and instigated the detention, which was carried out on her instruction and for her purpose: to hold Plaintiff until Dawkins and the Dean of Student Affairs could arrive.

300. Plaintiff was restrained by words and asserted authority. Dawkins was the Assistant Program Director and chair of the committee that controlled Plaintiff's progression. Her instruction was carried out on a student who had been told to come into the office "now" and was never told she was free to go. Plaintiff understood that she was not permitted to leave, and she did not leave until the Dean of Student Affairs released her.

301. The restraint was against Plaintiff's will. She did not consent to being held for Dawkins and the Dean.

302. Dawkins had no legal authority, and no color of legal authority, to detain Plaintiff.

303. The restraint was unreasonable and unwarranted by the circumstances. Dawkins knew Plaintiff was in acute distress — she had been notified by text message at 8:26 a.m. of Plaintiff's frantic search for her testing room — and she summoned no medical help. She had Plaintiff held not for care but for herself and the Dean of Student Affairs, who began the disciplinary process against Plaintiff that same day (paragraphs 92, 101, 104, and 105).

304. Plaintiff was aware of the restraint and was harmed by it. Confinement in the middle of an acute panic attack, waiting for the administrators who controlled her future, prolonged and compounded the episode.

305. Dawkins acted intentionally, entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff demands judgment against Kimberly Dawkins for compensatory damages; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXVI**

**Breach of Fiduciary Duty**

**(Against Matthew Holz, D.O., Individually)**

306. Plaintiff incorporates paragraphs 4, 11, 13, 37 through 39, 45 through 50, 81, 102, 105, 111, 114, 127 through 130, 138, and 139.

307. Dr. Holz undertook to advise and counsel Plaintiff. A physician who precepts PA Program students and lectures in the program, he counseled her on repairing her standing with the Director of Clinical Education who controlled her clinical placements, told her he would "help mentor" students through their mistakes, and — after she confided in him — renewed the offer: "Whatever mentoring or help you need along the way I'm always available" (paragraph 45).

308. Plaintiff depended on that counsel and reposed her confidence in him. Her placements and professional future turned on the faculty's view of her, and Dr. Holz was the faculty member positioned to help her repair it. In reliance on his undertaking, she confided to him — by personal email, outside University channels — a deeply personal family loss, her grief and heightened emotional and mental state, and her candid account of the SPPC meeting and of her difficulty with Professor Spaulding.

309. Dr. Holz accepted that confidence: he invited it, received it, counseled her on it, and renewed his offer of help after receiving it.

310. Plaintiff's reliance was reasonable — and heightened — because Dr. Holz is a physician, a professional whose defining obligations include the confidential handling of exactly such disclosures. What she confided was not trivial: it was the grief and heightened emotional state for which the University approved her emergency leave of absence weeks later. And no faculty member outside the accommodation process had any legitimate educational or administrative need for the correspondence itself.

311. A relationship of trust and confidence therefore existed between Plaintiff and Dr. Holz, and he owed her a duty not to disclose her confidences without her consent and a duty of candor about what he did with them.

312. Dr. Holz breached both duties. At 12:36 a.m. and 12:39 a.m. on February 20, 2025, without Plaintiff's consent, he forwarded her confidences to the Program Director and — at a personal Gmail account — to Professor Spaulding, the very faculty member about whom Plaintiff had confided her difficulty, writing, "That's all I got for you guys" (paragraph 46). When Plaintiff asked him the next day to keep her personal information confidential, he concealed what he had done — answering, "I do not know what you are going through" — urged her to "lean on" the Program Director he had already given her confidences to, and days later assured her in person that he "barely talk[ed]" with the program's faculty (paragraph 47).

313. As a direct and proximate result, Plaintiff's private grief, emotional state, and account of her difficulty with Professor Spaulding were placed in the hands of the officials who controlled her progression. Within a month, the SPPC — with both recipients among its members — brought Plaintiff before it under the "emotional health" standard; the Assistant Program Director later confronted her with what she had "shared" with "a physician"; and the recipient about whom she had confided wrote the report on which she was expelled (paragraphs 49, 81, 102, 114, and 127 through 130).

314. Plaintiff suffered humiliation, emotional distress, and mental anguish, and her psychiatric condition was aggravated, as alleged in paragraphs 138 and 139.

315. Dr. Holz acted intentionally — at night, through personal email accounts, and then concealing what he had done — entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff demands judgment against Matthew Holz, D.O., for compensatory damages, including damages for emotional distress, mental anguish, and

humiliation; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXVII**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against Lysa Diggins and Caitlin Spaulding, Individually)**

316. Plaintiff incorporates paragraphs 4, 9, 11, 12, 45 through 49, 51, 52, 60, 61, 76 through 78, 81, 102, 127 through 131, 138, and 139.

317. Dr. Holz, who had undertaken to mentor Plaintiff and had accepted her confidences, owed her a duty of confidence, and he breached it when he forwarded those confidences without her consent and then concealed the forward, as alleged in paragraphs 45 through 47.

318. Diggins and Spaulding each knew of the breach: what Dr. Holz sent them was, on its face, a student's private emails to a faculty mentor, written from her personal account, about a family loss and her emotional state. Upon information and belief, each had asked him for Plaintiff's correspondence, because his cover note — "That's all I got for you guys" — states that he was sending what he had gathered for both of them, and he sent it to both at the same time.

319. Diggins substantially assisted and encouraged the breach and its concealment. She accepted the confidences and kept them for nearly eight months. A month after receiving them, she solicited more of Plaintiff's confidences under an assurance of confidentiality without disclosing that she held the forward (paragraph 51). Upon information and belief, she used them in the SPPC's March 20, 2025 review of Plaintiff's "emotional health" and interpersonal standards, because she had received them a month earlier, the review addressed the same subjects, and she spoke for the committee. And when Plaintiff asked on October 8, 2025 for the emails concerning her leave, Diggins printed the forward the next afternoon and then answered without disclosing it, keeping the breach hidden from the person it injured (paragraphs 49, 60, and 61).

320. Spaulding substantially assisted and encouraged the breach and its concealment. She received the confidences at a personal Gmail account, outside the University's systems. Upon information and belief, she used them in the same March 20 review, because she had received them a month earlier and sat on the committee that conducted it. And in the months that

followed — while she controlled Plaintiff's placements, confronted her at Florida Atlantic University, and reported on her conduct — she never disclosed that she held Plaintiff's private emails, including Plaintiff's candid account of her difficulty with Spaulding herself (paragraphs 49, 76 through 78, and 102).

321. Neither's conduct served any legitimate function of the University: obtaining a student's private correspondence with a mentor through a back channel — for Spaulding, a personal email account — and hiding it from the student is no part of any program official's duties, and the University's own policies reserve students' health and disability information to the Dean of Student Affairs.

322. As a direct and proximate result, Plaintiff suffered the injuries alleged in paragraphs 138 and 139, and she lost the chance to protect herself — by reassignment, grievance, or other relief — before the officials who held her confidences acted against her.

323. Diggins and Spaulding each acted intentionally, entitling Plaintiff to punitive damages against each of them.

WHEREFORE, Plaintiff demands judgment against Lysa Diggins and Caitlin Spaulding, and each of them, for compensatory damages, including damages for emotional distress, mental anguish, and humiliation; punitive damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXVIII**

**Negligent Undertaking**

**(Against South University–Florida and South University–Savannah)**

324. Plaintiff incorporates paragraphs 4 through 8, 13, 34, 50 through 58, 75, 87 through 114, and 134 through 137.

325. The University undertook, for Plaintiff's benefit, to monitor and support her emotional health after her leave: Dr. Dean undertook to "meet once a month to discuss your mental and physical progress"; the Re-entry Plan required "[r]outine monthly check-ins" to "discuss emotional health"; and the SPPC made check-ins with Dr. Dean "[m]andatory" for "support & academic monitoring."

326. Having undertaken that service, the University owed Plaintiff a duty to perform it with reasonable care.

327. The University breached that duty. It held one check-in in July 2025, canceled the next, held none after the plan was signed or after the check-ins were made mandatory, and set the next for the day of the crisis. When the crisis came, it summoned no medical help and treated the episode as misconduct.

328. The University's failure increased the risk that an emotional-health episode would be met with discipline rather than support, and Plaintiff relied on the undertaking by accepting the University's monitoring as the condition and structure of her return instead of arranging other support within the program.

329. This Count does not challenge the quality of Plaintiff's education. It concerns a specific, ministerial undertaking the University assumed and failed to perform.

330. As a direct result, Plaintiff suffered the losses alleged in paragraphs 134 through 137.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**COUNT XXIX**

**Negligent Supervision**

**(Pleaded in the Alternative to the Allegation of Course and Scope of Employment)**

**(Against South University–Florida and South University–Savannah)**

331. Plaintiff incorporates paragraphs 4 through 12, 26, 38 through 40, 45 through 48, 76, 79, 81, 87 through 115, 122 through 131, and 134 through 137.

332. This Count is pleaded in the alternative, to the extent Professor Spaulding, Dr. Dawkins, or any other University employee committed the torts alleged in Counts XX, XXI, XXV, and XXVII outside the course and scope of employment.

333. The University employed Professor Spaulding and Dr. Dawkins and had a duty to supervise them in their dealings with students.

334. Before December 5, 2025, the University knew or should have known that they posed a risk to Plaintiff. Its Program Director received, on February 20, 2025, Plaintiff's written account of "fear tactics and threats" from Professor Spaulding and Dr. Dawkins and Dr. Holz's observation that Professor Spaulding had taken a student's classroom question as "an insult" (paragraphs 45 and 46); on November 4, 2025 — after Professor Spaulding relayed to the SPPC

an undocumented accusation Plaintiff disputed as false (paragraph 76) — Plaintiff asked the Program Director in writing to confirm that everything considered against her had come "through official evaluation forms or documented channels," and received no reply; that day the University also agreed that Plaintiff's interactions with Professor Spaulding would be collective, not one-on-one (paragraph 79); and on or about November 14, 2025, Plaintiff complained that her confidential information was circulating among faculty (paragraph 81).

335. The University failed to take appropriate action. It left Professor Spaulding in sole charge of Plaintiff's examination-day logistics, let her confront Plaintiff in a hallway, and accepted her uncorroborated threat report as the basis for expulsion without investigation and without the SPPC review the Catalog requires.

336. As a direct result, Plaintiff suffered the injuries alleged in paragraphs 134 through 137.

WHEREFORE, Plaintiff demands judgment against South University–Florida and South University–Savannah, jointly and severally, for compensatory damages; costs; pre- and post-judgment interest; and such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated: November 10, 2026.

Respectfully submitted,

/s/ Zachary S. Gaynor
Zachary S. Gaynor, Esq.
Florida Bar No. 125534
A Students' Lawyer
8903 Glades Rd, Ste A8 #2322
Boca Raton, FL 33434
Tel: (561) 308-9119
Primary email: zachary@astudentslawyer.com
Astudentslawyer.com
Counsel for Plaintiff